**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MISSOURI**
**CENTRAL DIVISION**

| | | |
|---|---|---|
| MICHAEL POSTAWKO, | ) | |
| | ) | |
| CHRISTOPHER BAKER, and | ) | |
| | ) | |
| MICHAEL JAMERSON, | ) | |
| *on behalf of themselves and a class of* | ) | |
| *similarly situated individuals*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 16-CV-4219-NKL-P |
| | ) | |
| MISSOURI DEPARTMENT OF | ) | |
| CORRECTIONS, | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| CORIZON, LLC, | ) | |
| | ) | |
| GEORGE LOMBARDI, *in his official capacity* | ) | |
| *as Director of the Missouri Department* | ) | |
| *of Corrections*, | ) | |
| | ) | |
| DR. TRINIDAD AGUILERA, *in his individual* | ) | |
| *capacity,* | ) | |
| | ) | |
| DR. JOHN WILLIAMS, *in his individual* | ) | |
| *capacity* | ) | |
| | ) | |
| DR. UNKNOWN STAMPS, *in her individual* | ) | |
| *capacity*, | ) | |
| | ) | |
| DR. THOMAS PRYOR, *in his individual* | ) | |
| *capacity,* | ) | |
| | ) | |
| DR. UNKNOWN PROCTOR, *in his individual* | ) | |
| *capacity,* | ) | |
| | ) | |
| DR. UNKNOWN HARDMAN, *in his individual* | ) | |
| *capacity,* | ) | |
| | ) | |
| DR. UNKNOWN DAVISON, *in his individual* | ) | |
| *capacity,* | ) | |
| | ) | |

1

DR. PAUL JONES, *in his individual capacity*,                          )
                                                                       )
                                                                       )
UNKNOWN STIEFERMAN, *in her individual capacity*,                      )
                                                                       )
                                                                       )
DR. T. BREDEMAN, *in his individual capacity*,                         )
                                                                       )
JULIE FIPPS, *in her individual capacity*,                             )
                                                                       )
UNKNOWN COFIELD, *in his or her individual capacity*,                  )
                                                                       )
                                                                       )
UNKNOWN RUCKER, *in her individual capacity*,                          )
                                                                       )
JAMIE CAMPBELL, *in her individual capacity*,                          )
                                                                       )
                                                                       )
DAWN BAKER, *in her individual capacity*,                              )
                                                                       )
GEENEEN WILHITE, *in her individual capacity,*                         )
                                                                       )
                                                                       )
ADRIENNE HARDY, *in her individual capacity*,                          )
                                                                       )
                                                                       )
BONNIE BOLEY, *in her individual capacity*,                            )
                                                                       )
AMANDA YATES, *in her individual capacity*,                            )
                                                                       )
JULIE UNKNOWN, *in her individual capacity*,                           )
                                                                       )
JOHN OR JANE DOE I–III, *in their individual capacities*,              )
                                                                       )
                                                                       )
                                    Defendants.                        )

## SECOND AMENDED COMPLAINT

## INTRODUCTION

1.      The Missouri Department of Corrections (MDOC) and Corizon, LLC have

created and maintained a policy or custom and practice of systematically denying necessary

medical care to inmates diagnosed with Hepatitis C viral infections (HCV), thereby

discriminating against them and placing them at substantial and unnecessary risk for severe pain, illness, injury, and death. The individual defendants have denied necessary medical care to Plaintiffs, who have been diagnosed with chronic HCV, and have caused them unnecessary pain and suffering and irreversible liver damage.

2.  Plaintiffs bring this action seeking prospective relief on behalf of themselves and a class of similarly situated individuals to remedy the ongoing deprivation of their rights guaranteed by the Eighth Amendment of the United States Constitution (as incorporated by the Fourteenth Amendment) and the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 *et seq*. In addition, the named Plaintiffs seek an award of damages for the harm caused to them by the violation of their constitutional and statutory rights to life-saving treatment.

3.  Plaintiffs Michael Postawko, Christopher Baker, and Michael Jamerson are incarcerated in the Missouri Department of Corrections with serious health complications stemming from their chronic Hepatitis C viral infections. Defendants have refused to provide medical treatment to Plaintiffs and others with HCV that is consistent with current and prevailing medical standards. As a result, Defendants have harmed, and continue to harm, Plaintiffs.

## JURISDICTION AND VENUE

4.  Plaintiffs bring this action pursuant to 42 U.S.C. § 1983, the Eighth and Fourteenth Amendments to the United States Constitution, 42 U.S.C. § 1331, and 42 U.S.C. § 1343.

5.  Venue is appropriate in this district pursuant to 28 U.S.C. § 1391(g) and L.R. 3.1(a)(2) because substantial events at issue in this litigation occurred in the Western District of Missouri and in the County of Cole, Missouri.

## PARTIES

6.      Plaintiff Michael Postawko is an adult individual currently incarcerated at Jefferson City Correctional Center in Jefferson City, Missouri (JCCC). Postawko seeks injunctive and declaratory relief on behalf of himself and on behalf of a class of plaintiffs who are currently or will in the future be subject to the discriminatory and unconstitutional policy of Defendants MDOC, Lombardi, and Corizon for treating individuals with Hepatitis C infections, as well as damages on his individual claims.

7.      Plaintiff Christopher Baker is an adult individual currently incarcerated at Algoa Correctional Center in Jefferson City, Missouri (Algoa). Baker seeks injunctive and declaratory relief on behalf of himself and on behalf of a class of plaintiffs who are currently or will in the future be subject to the discriminatory and unconstitutional policy of Defendants MDOC, Lombardi, and Corizon for treating individuals with Hepatitis C infections, as well as damages on his individual claims.

8.      Plaintiff Michael Jamerson is an adult individual currently incarcerated at Missouri Eastern Correctional Center in Pacific, Missouri (MECC). Jamerson seeks injunctive and declaratory relief on behalf of himself and on behalf of a class of plaintiffs who are currently or will in the future be subject to the discriminatory and unconstitutional policy of Defendants MDOC, Lombardi, and Corizon for treating individuals with Hepatitis C infections, as well as damages on his individual claims.

9.      Defendant Missouri Department of Corrections (MDOC) is a state executive agency that has the power to sue and be sued pursuant to Mo. Rev. Stat. § 217.020. MDOC is responsible for providing treatment for the serious medical needs of individuals in its custody.

4

10. Defendant George Lombardi is the Director of MDOC. He is responsible for the operations of MDOC, including adopting, approving, and implementing the policies applicable to the prisons that MDOC operates throughout the State of Missouri. Upon information and belief, Director Lombardi is the final policymaker for MDOC. He is sued in his official capacity.

11. Defendant Corizon, LLC is the health care provider for all MDOC facilities. Corizon, LLC is a Missouri limited liability company with its principal place of business located in Brentwood, Tennessee.

12. Defendant Trinidad Aguilera was, at all times relevant to this complaint, a doctor at Moberly Correctional Center who was a treating physician of Baker and exhibited deliberate indifference by failing to provide Baker with any HCV treatment and failing to conduct proper testing, monitoring, and consulting. He is sued in his individual capacity.

13. Defendant John Williams was, at all times relevant to this complaint, a doctor at MECC who was a treating physician of Jamerson and exhibited deliberate indifference by failing to provide Jamerson with any HCV treatment and failing to conduct proper testing, monitoring, and consulting. He is sued in his individual capacity.

14. Defendant Unknown Stamps was, at all times relevant to this complaint, a doctor at Algoa who was a treating physician of Baker and exhibited deliberate indifference by failing to provide Baker with any HCV treatment and failing to conduct proper testing, monitoring, and consulting. She is sued in her individual capacity.

15. Defendant Thomas Pryor was, at all times relevant to this complaint, a doctor at JCCC who was a treating physician of Postawko and exhibited deliberate indifference by failing to provide Postawko with any HCV treatment and failing to conduct proper testing, monitoring, and consulting. He is sued in his individual capacity.

5

16.     Defendant Unknown Proctor was, at all times relevant to this complaint, a doctor at JCCC who was a treating physician of Postawko and exhibited deliberate indifference by failing to provide Postawko with any HCV treatment and failing to conduct proper testing, monitoring, and consulting. He is sued in his individual capacity.

17.     Defendant Unknown Hardman was, at all times relevant to this complaint, a doctor at JCCC who was a treating physician of Postawko and exhibited deliberate indifference by failing to provide Postawko with any HCV treatment and failing to conduct proper testing, monitoring, and consulting. He is sued in his individual capacity.

18.     Defendant Unknown Davison was, at all times relevant to this complaint, a doctor at JCCC who was a treating physician of Postawko and exhibited deliberate indifference by failing to provide Postawko with any HCV treatment and failing to conduct proper testing, monitoring, and consulting. He is sued in his individual capacity.

19.     Defendant Paul Jones, M.D., was, at all times relevant to this complaint, a doctor at Moberly Correctional Center who was a treating physician of Baker and exhibited deliberate indifference by failing to provide Baker with any HCV treatment and failing to conduct proper testing, monitoring, and consulting. He is sued in his individual capacity.

20.     Defendant Unknown Stieferman was, at all times relevant to this complaint, a nurse practitioner at JCCC who was a medical treater of Postawko and exhibited deliberate indifference by failing to provide Postawko with any HCV treatment and failing to conduct proper testing, monitoring, and consulting. She is sued in her individual capacity.

21.     Defendant T. Bredeman, D.O., was, at all times relevant to this complaint, a physician and associate regional medical director who reviewed and denied grievances related to treatment for Hepatitis C viral infection from the three Plaintiffs and exhibited deliberate

indifference by failing to direct their treaters to provide HCV treatment or and to conduct proper testing, monitoring, and consulting. He is sued in his individual capacity.

22. Defendant Julie Fipps was, at all times relevant to this complaint, a registered nurse, health services administrator, and medical director who reviewed and denied a grievance related to treatment for Hepatitis C viral infection from Jamerson and exhibited deliberate indifference by failing to direct Jamerson's treaters to provide HCV treatment or to conduct proper testing, monitoring, and consulting. She is sued in her individual capacity.

23. Defendant J. Cofield was, at all times relevant to this complaint, director of operations of constituent services over JCCC and Moberly Correctional Center, knew of Postawko's and Baker's chronic HCV, denied HCV-related grievances by Postawko and Baker, and exhibited deliberate indifference by failing to direct Postawko and Baker's treaters to provide HCV treatment or to conduct proper testing, monitoring, and consulting. She is sued in her individual capacity.

24. Defendant Unknown Rucker was, at all times relevant to this complaint, a nurse and treating health care provider at Moberly Correctional Center, where she exhibited deliberate indifference by denying HCV treatment to Baker and failing to conduct proper testing, monitoring, and consulting. She is sued in her individual capacity.

25. Defendant Geeneen Wilhite was, at all times relevant to this complaint, a registered nurse and director of nursing at Moberly Correctional Center, knew of Baker's chronic HCV, denied HCV-related grievances by Baker, and exhibited deliberate indifference by failing to direct Baker's treaters to provide HCV treatment or to conduct proper testing, monitoring, and consulting.

26.     Defendant Bonnie Boley was, at all times relevant to this complaint, a registered nurse and health services administrator at Moberly Correctional Center who knew Baker complained of liver pain, denied his liver pain-related grievance, and exhibited deliberate indifference by failing to direct Baker's treaters to provide HCV treatment or to conduct proper testing, monitoring, and consulting. She is sued in her individual capacity.

27.     Defendant Adrienne Hardy was, at all times relevant to this complaint, a registered nurse and medical contract monitor at JCCC, who was aware of Baker's chronic HCV and denied an HCV-related grievance by Baker on the grounds that he was being seen by a doctor and was enrolled in the Chronic Care Clinic, although she knew he was not receiving HCV treatment, and exhibited deliberate indifference by failing to direct Baker's treaters to provide HCV treatment or to conduct proper testing, monitoring, and consulting. She is sued in her individual capacity.

28.     Defendant Jamie Campbell was, at all times relevant to this complaint, a nurse and the Chronic Care Clinic nurse at MECC, where she exhibited deliberate indifference by failing to treat Jamerson's HCV and failing to conduct proper testing, monitoring, and consulting. She is sued in her individual capacity.

29.     Defendant Dawn Baker was, at all times relevant to this complaint, a registered nurse and the director of nursing, who was aware of Jamerson's complaint related to failure to provide HCV treatment, denied his HCV-related informal resolution request, and exhibited deliberate indifference by failing to direct Jamerson's treaters to provide treatment or to conduct proper testing, monitoring, and consulting. She is sued in her individual capacity.

30.     Defendant Amanda Yates was, at all times relevant to this complaint, a nurse and treating health care provider at MECC, where she exhibited deliberate indifference by denying

HCV treatment to Jamerson and failing to conduct proper testing, monitoring, and consulting. She is sued in her individual capacity.

31. Defendant Julie Unknown was, at all times relevant to this complaint, a nurse and the Chronic Care Clinic nurse at MECC, where she exhibited deliberate indifference by failing to treat Jamerson's HCV and to conduct proper testing, monitoring, and consulting. She is sued in her individual capacity.

32. Defendants Jane or John Doe I–III are additional health care providers working within the MDOC who exhibited deliberate indifference to the serious medical needs of Postawko, Baker, or Jamerson by failing to provide HCV treatment or to conduct proper testing, monitoring, and consulting. They are sued in their individual capacities.

33. At all times relevant, Defendants acted under color of state law.

## FACTS

### Chronic Hepatitis C Virus

34. HCV is a viral infection that attacks the liver and causes hepatitis, or liver inflammation. It is spread primarily through contact with infected blood.

35. Liver inflammation caused by HCV can significantly impair liver function and damage its crucial role in digesting nutrients, filtering toxins from the blood, preventing disease, and making possible essentially all metabolic processes in the body.

36. Liver impairment can cause severe pain, abdominal and gastrointestinal problems, fatigue, weakness, and muscle wasting, difficulty or pain with urination, increased risk of heart attacks, and other side effects.

37. HCV can be either acute or chronic. A small percentage of people who are exposed to infected blood develop an acute infection that their body resolves without treatment.

9

But a significant majority (75% to 85%) of people who develop acute HCV go on to develop chronic HCV.

38.     People with chronic HCV develop fibrosis of the liver, which is a process by which healthy liver tissue is replaced with scarring. Scar tissue cannot perform any of the jobs of normal liver cells, so fibrosis reduces liver function.

39.     When scar tissue begins to take over most of the liver, this extensive fibrosis is termed cirrhosis.

40.     Cirrhosis is irreversible. It can, and often does, cause additional painful complications, including widespread itching, arthritic pain throughout the body, kidney disease, jaundice, fluid retention with edema, internal bleeding, easy bruising, abdominal ascites, mental confusion, lymph disorders, and even more extreme fatigue.

41.     In part because it can be difficult to determine exactly when significant hepatitic fibrosis becomes cirrhosis, most of these complications can occur before cirrhosis. If these complications go untreated, some can cause death.

42.     Health care providers who provide care to people with chronic HCV need to be aware of how drugs they prescribe can cause or exacerbate stress to the liver and need to counsel their HCV-positive patients appropriately about prescription and over-the-counter medications that affect the liver, including ibuprofen, naproxen, large doses of acetaminophen, and others.

43.     In addition to causing day-to-day pain and other problems, chronic HCV also dramatically increases a person's risk of developing cirrhosis and liver cancer.

44.     Of those with chronic HCV, at least half will develop cirrhosis or liver cancer, and almost everyone (70% to 95%) will develop chronic liver disease.

45.     Some 19,000 people die of HCV-caused liver disease every year in the United States. HCV is the leading indication for liver transplants in the United States.

46.     Hepatitis C virus is rampant in correctional facilities, including within the facilities of the Missouri Department of Corrections.

47.     At least 10% to 15% of the population under the supervision, care, and custody of the Missouri Department of Corrections is infected with HCV.

48.     Since more than 90% of persons who are incarcerated are eventually released into the community, most of this population will return to the general population.

49.     Each day without treatment increases a person's likelihood of developing chronic liver disease, fibrosis, cirrhosis, liver cancer, painful complications, death from liver failure, and the risk of transmitting HCV to others.

50.     For persons with cirrhosis, each day without treatment causes additional irreversible scarring and permanently reduces the function of the liver.

51.     As of January 2015, MDOC reported that it was treating 0.11 percent of HCV-positive inmates under its supervision, or 5 inmates out of 4,736 inmates with known HCV infections.

### *Standard of Care for HCV*

52.     HCV treatment is successful when it results in a sustained virologic response (SVR) for three months following the end of treatment. SVR occurs when a person's blood has no detectable genetic material of the Hepatitis C virus. The medical community recognizes SVR as tantamount to a cure.

53.     For many years, finding and establishing an effective and safe treatment for Hepatitis C infections was a highly elusive goal. The standard treatment, which included the use

of interferon and ribavirin medications, failed to cure most patients and was associated with painful and other adverse side effects, including psychiatric and autoimmune disorders, flulike symptoms, and gastrointestinal distress.

54.     In the past four years, the Federal Drug Administration has approved new medications, called direct-acting antiviral drugs (DAA drugs), which have proven to work more quickly, cause fewer side effects, and treat chronic HCV much more effectively.

55.     In 2011, the FDA approved the use of protease inhibitors called boceprevir (under brand name Victrelis) and telaprevir (under brand name Incivek), and the standard of care developed into a "triple therapy" to include the combination of either boceprevir or telaprevir, plus ribavirin and interferon. The triple therapy improved results for many patients, but continued to produce painful and adverse side effects, and the treatment could take 48 weeks to complete. Manufacturing of these drugs for the United States was discontinued between 2014 and 2015 because later treatments are superior.

56.     In 2013, the FDA approved DAA medications called simeprevir (under brand name Olysio) and sofosbuvir (under brand name Sovaldi). At this time, the recommended treatment was a DAA drug such as Sovaldi combined with either ribavirin or interferon, depending on the patient's other symptoms and medical diagnoses.

57.     In late 2014, the FDA approved the use of Sovaldi in combination with Olysio for the treatment of Hepatitis C.

58.     On October 10, 2014, the FDA approved a DAA drug called Harvoni, which is a pill that is taken once a day and combines sofosbuvir and ledipasvir.

59.     On December 19, 2014, the FDA approved a DAA drug under the brand name Viekira Pak, which combines a multi-ingredient tablet with ombitasvir, paritaprevir, and ritonavir and a tablet with dasabuvir.

60.     In July 2015 and later expanded in February 2016, the FDA approved daclatasvir (under brand name Daklinza) for use with or without ribavirin for patients with one of two variations of chronic HCV, including the most common genotype in the United States.

61.     Also in July 2015, the FDA approved a pill that combines ombitasvir, paritaprevir, and ritonavir (under brand name Technivie), for use with ribavirin, for treatment of one variation of chronic HCV for patients without cirrhosis.

62.     In January 2016, the FDA approved a pill that combines elbasvir and grazoprevir (under brand name Zepatier) for the treatment of two variations of chronic HCV, including the most common genotype in the United States.

63.     On June 28, 2016, the FDA approved Epclusa, another new DAA drug that combines sofosbuvir and velpatasvir. It is the first drug approved to treat all six major variations, or genotypes, of HCV.

64.     Sovaldi (sofosbuvir), Olysio (simeprevir), Harvoni (sofosbuvir/ledipasvir), Viekira Pak (ombitasvir/paritaprevir/ritonavir/dasabuvir), Daklinza (daclatasvir), Technivie (ombitasvir/paritaprevir/ritonavir), Zepatier (elbasvir/grazoprevir), and Epclusa (sofosbuvir/velpatasvir) have few side effects, dramatically greater efficacy, can reduce treatment duration by up to 75 percent (from 48 weeks to 12 weeks in many cases), and are administered orally rather than by injections.

65.     These eight drugs are manufactured by five different drug companies:

    a.  Sovaldi, manufactured by Gilead Sciences

13

b. Olysio, manufactured by Janssen Research & Development

c. Harvoni, manufactured by Gilead Sciences

d. Viekira Pak, manufactured by AbbVie

e. Daklinza, manufactured by Bristol-Myers Squibb

f. Technivie, manufactured by AbbVie

g. Zepatier, manufactured by Merck & Co., Inc.

h. Epclusa, manufactured by Gilead Sciences

66. Over 90 percent of patients treated with any of these DAA drugs are cured.

67. Because of the obvious advantages of the DAA drugs, the medical standard of care for HCV is now well-established. The CDC encourages health care professionals to follow the evidence-based standard of care developed by the Infectious Diseases Society of America (IDSA) and the American Association for the Study of Liver Diseases (AASLD).

68. The IDSA/AASLD guidelines are the medical standard of care.

69. Under the IDSA/AASLD guidelines, some groups of people should be routinely tested for HCV, including all persons born between 1945 and 1965 and all persons who were ever incarcerated.

70. As of January 2015, MDOC did not have a policy of routine opt-out testing for inmates under its supervision and care.

71. When the CDC/IDSA/AASLD standard of care was updated immediately after the first DAA drug was approved, these organizations provided "prioritization tables" and guidance on selecting patients with the greatest need because the "infrastructure . . . did not yet exist to treat all patients immediately."

14

72.     But on July 6, 2016, these organizations updated the standard of care in recognition of the fact that continuing medical research has demonstrated the safety, tolerability, and dramatic benefits of treating *all* persons with chronic HCV.

73.     The benefits demonstrated through vigorous research include: immediate decrease in liver inflammation, reduction in the rate of progression of liver fibrosis, improvement in necrosis and cirrhosis, reduction in portal hypertension and spleen enlargement, reduction in severe side effects including cryoglobulinemic vasculitis, a 70% reduction in the river of liver cancer, a 90% reduction in the risk of liver-related mortality, and a dramatic increase in quality of life.

74.     Other studies show treatment delay decreases the benefits associated with cure.

75.     Under the current prevailing standard of care, treatment with DAA drugs "is expected to benefit nearly all chronically infected persons" and the CDC, AASLD, and ISDA recommend treatment for all patients with chronic HCV infection.

### *Methods for Determining Progression of Fibrosis/Cirrhosis*

76.     A person is generally diagnosed with HCV through a rapid blood test in which the blood is examined for HCV antibodies. A follow-up blood test determines whether the genetic material (RNA) of the Hepatitis C virus remains in the blood. Finally, a third blood test can determine which variation, or genotype, of HCV a person has.

77.     These diagnostic tests are different from the test(s) used to determine the progression of a person's fibrosis or cirrhosis.

78.     The severity of a person's fibrosis or cirrhosis should never be used to determine whether a person should be treated.

79.     Although the standard of care is to treat all persons with chronic HCV with DAA drugs, it is still useful to determine the progression (staging) of fibrosis and/or cirrhosis in the liver to choose among the DAA drugs for the most appropriate treatment module for HCV, to treat other conditions or complications a person may be experiencing, and to advise patients about contraindications and drugs to avoid.

80.     Health care providers use several methods to determine the advancement of a HCV-positive person's cirrhosis or fibrosis. These methods include, but are not limited to:

    a.  Liver biopsy – a surgery where a provider removes a small sample of liver tissue and undertakes a histological assessment

    b.  APRI (AST to Platelet Ratio Index) – using a blood sample, a ratio derived using the level of a certain enzyme in the blood, aspartate aminotransferase (AST), and comparing it to (1) usual amount of AST in the blood of a healthy person and (2) the number of platelets in the affected person's blood

    c.  FIB-4 – using a blood sample, a ratio derived using the level of two enzymes in the blood, AST and alanine aminotransferase (ALT), as well as platelet count and the person's age

    d.  FibroScan – a type of ultrasound known as transient elastography, which images a several-centimeter mass of liver tissue

81.     When an APRI score is extremely high, it has good diagnostic utility in predicting severe fibrosis or cirrhosis, but low and mid-range scores miss many people who have significant fibrosis or cirrhosis.

82.    For instance, in more than 90% of cases, an APRI score of at least 2.0 indicates that a person has cirrhosis. But more than half of people with cirrhosis will not have an APRI score of at least 2.0.

83.    Where a person has been diagnosed with cirrhosis through some other means, an APRI score is irrelevant and using an APRI score to measure the progression of fibrosis is unnecessary.

84.    In addition, because the levels of AST and ALT fluctuate from day to day, a decreased or normalized level does not mean the condition has improved, and even a series of normal readings over time may fail to accurately show the level of fibrosis or cirrhosis.

85.    Furthermore, not only do the levels of elevation of AST and ALT often fail to show the current level of fibrosis or cirrhosis, they also often fail to predict the eventual outcomes of a failure to treat the disease in a specific person.

86.    Moreover, an APRI score relies only on AST and fails to take into account ALT, even though—because ALT is found predominately in the liver and not all over the body like AST—ALT is a more specific indicator of liver inflammation than AST.

87.    For all these reasons, using APRI score alone to determine the severity of a person's fibrosis or cirrhosis is not adequate or appropriate.

### *HCV Treatment Policy of Defendants Lombardi, MDOC, and Corizon*

88.    Defendants Lombardi, MDOC, and Corizon have a policy or custom of not providing DAA drug treatment to all inmates with HCV, or even all inmates with chronic HCV, in contravention of the prevailing standard of care and in deliberate indifference to the serious medical need for treatment.

89.     Defendants Lombardi, MDOC, and Corizon have a policy or custom of using an APRI score—which measures the progression of fibrosis or cirrhosis—to determine whether a person should be treated, in contravention of the prevailing standard of care and in deliberate in difference to serious medical need.

90.     Defendants Lombardi, MDOC, and Corizon have a policy or custom of not undertaking liver biopsies, FIB-4, FibroScan, or other methods of determining the stage of fibrosis or cirrhosis and relying exclusively on APRI score to determine that stage, in contravention of the prevailing standard of care and in deliberate indifference to serious medical need.

91.     Defendants Lombardi, MDOC, and Corizon have a policy or custom of failing to even consider providing treatment to HCV-positive inmates unless they have an "APRI score" above 2.0 that persists for several months, even though more than half of persons with cirrhosis will not have an APRI score at or above 2.0 and they know that AST levels are transient, in contravention of the prevailing standard of care and in deliberate indifference to serious medical need.

92.     Defendants Lombardi, MDOC, and Corizon have a policy or custom of disregarding independent diagnoses of cirrhosis or significant hepatitic fibrosis in making treatment decisions, in contravention of the prevailing standard of care and in deliberate indifference to serious medical need.

93.     Defendants Lombardi, MDOC, and Corizon have a policy or custom of basing treatment decisions on cost, rather than on need for treatment, in contravention of the prevailing standard of care and in deliberate indifference to serious medical need.

94.     These policies or customs have caused, and continue to cause, unnecessary and wanton infliction of pain and an unreasonable risk of serious damage to the health of HCV-positive inmates.

95.     Contrary to the proper and necessary medical procedures and the community standard of care, Defendants Lombardi, MDOC, and Corizon have repeatedly denied requests by Plaintiffs Postawko, Baker, and Jamerson, and by other members of the class, for the appropriate and medically necessary direct-acting antiviral treatment for their Hepatitis C infections.

96.     Instead, Defendants Lombardi, MDOC, and Corizon classify inmates with known HCV infection as "Chronic Care Clinic Offenders." Instead of receiving treatment, these inmates receive a blood draw every six months and, at times, minimal counseling.

97.     Defendants Lombardi, MDOC, and Corizon have a policy or custom of failing to require appropriate counsel of HCV-positive patients, and continuity of care across the DOC system, related to contraindications for other medications that exacerbate liver damage, in contravention of the prevailing standard of care and in deliberate indifference to serious medical need.

98.     Defendants Lombardi, MDOC, and Corizon have a policy or custom of permitting "Chronic Care Clinic" visits with HCV-positive inmates to be conducted by videoconference, so a visual and physical inspection of the liver cannot be undertaken, in contravention of the prevailing standard of care and in deliberate indifference to serious medical need.

99.     Upon information and belief, MDOC receives additional funding from the State of Missouri for inmates classified as "Chronic Care Clinic Offenders" even though the additional monitoring HCV-positive inmates receive is minimal and, in most cases, they receive no additional treatment.

*Plaintiff Michael Postawko*

100.     Postawko became infected with HCV while under the care and supervision of MDOC, in or around 2012.

101.     Postawko was asymptomatic for approximately one-and-one half to two years and signed paperwork indicating that he refused treatment for HCV.

102.     Sometime in 2014, he began experiencing adverse symptoms and requested treatment at a Chronic Care visit with Defendant Davison.

103.     Defendants Davison and every other treater Postawko has seen at MDOC or who has reviewed his HCV-related complaints, including Defendants Pryor, Proctor, Hardman, Jones, Stieferman, Bredeman, Cofield and Does I–III, have acted with deliberate indifference and have refused to treat Postawko with DAA drugs in contravention of the prevailing standard of care.

104.     Postawko is experiencing serious symptoms consistent with HCV symptoms. He is thoroughly racked with fatigue to the point that brushing his teeth causes intense aching in his arm muscles; he also experiences fever, abdominal pain, severe headaches, almost constant joint pain, and has dark urine with what appears to be traces of blood. Medications he receives for his severe headaches, sumatriptan and propranolol HCL, are only about 50% to 60% effective.

105.     To date, Postawko has received no treatment for HCV.

106.     Although Postawko has requested treatment multiple times and has submitted substantial evidence of his attempts to complete the MDOC grievance process, this Court found that "he has either not received timely responses or received responses that violated prison policy," so he has exhausted his administrative remedies.

*Plaintiff Christopher Baker*

107.     In 2005, Plaintiff Christopher Baker was diagnosed with HCV.

108. In 2007, Baker underwent a liver biopsy and was diagnosed with cirrhosis at the University of Missouri Hospital in Columbia, Missouri.

109. In 2008, Baker was sentenced to ten years in MDOC for a repeat offense of driving while intoxicated.

110. In 2009, MDOC began treating Baker with the then-prevailing treatment, interferon and ribavirin, and it appeared to be working.

111. However, after five months of treatment, MDOC—through a provider named Dr. McKinney—informed Baker that MDOC was no longer treating HCV-positive inmates with interferon and ribavirin and discontinued Baker's course of treatment.

112. Since early 2010, Baker has received no further treatment for HCV and has received no treatment at any time with a DAA drug.

113. Each treater Baker has seen at MDOC or who has denied his HCV-related complaints, including Defendants Stamps, Jones, Aguilera, Bredeman, Cofield, Rucker, Wilhite, Boley, Hardy, and Does I–III, has acted with deliberate indifference and has refused to treat Baker with DAA drugs in contravention of the prevailing standard of care.

114. On March 2, 2016, while Baker was incarcerated at Jefferson City Correctional Center, an Informal Resolution Request response to Baker indicates that he was "placed on spreadsheet" because he had an APRI score above 1.0 (without regard for his independent diagnosis of cirrhosis by liver biopsy before incarceration).

115. However, no treatment resulted.

116. In July, Baker was transferred from JCCC to Algoa Correctional Center, where he no longer appears even on any list for treatment.

117. Baker is experiencing serious symptoms consistent with HCV symptoms. He has nausea, severe joint pain, extreme fatigue, back and chest pain, tenderness in the area of his liver, and dark urine.

118. Baker has completed the grievance process several times. He has exhausted his administrative remedies.

*__Plaintiff Michael Jamerson__*

119. Plaintiff Michael Jamerson became infected with HCV while under the care and supervision of MDOC.

120. In 2015, at his request, Jamerson was tested for HCV.

121. Jamerson has repeatedly requested treatment with DAA drugs, including Harvoni.

122. Although Jamerson is enrolled in the Hepatitis C Chronic Care Clinic, he has not received treatment with any DAA drug.

123. Defendants Williams, Campbell, Fipps, Baker, Bredeman, Yates, Julie Unknown, Does I-III, and every other medical provider Jamerson has seen at MDOC or who has directed his course of treatment, have acted with deliberate indifference and have refused to treat Jamerson with DAA drugs in contravention of the prevailing standard of care.

124. Jamerson is currently experiencing serious symptoms consistent with HCV symptoms, including fatigue, muscle and joint pain, pain in his stomach and liver area, and chest pain. He has severe joint pain and extreme fatigue, back and chest pain, tenderness in the area of his liver

125. To date, Jamerson has not received any treatment for his HCV.

126. Jamerson has exhausted his administrative remedies.

## *Class Action Allegations*

127.     Plaintiffs bring their class for prospective relief against MDOC, Corizon, and Lombardi as a class action on behalf of themselves and all others similarly situated pursuant to Rules 23(a) and 23(b)(2).

128.     Plaintiffs seek to represent the following class on claims for declaratory and injunctive relief: individuals in the custody of MDOC who have been or will be diagnosed with HCV but who are not provided treatment with DAA drugs.

129.     As a result of Defendants MDOC, Lombardi, and Corizon's deliberate indifference to the serious medical needs of the class, members of the class are or will be subjected to cruel and unusual punishment and deprived of their constitutional and statutory rights. Plaintiffs seek declaratory and injunctive relief to remedy Defendants' illegal and unconstitutional actions, policies and customs, and practices.

130.     The information as to the precise size of the class and the identity of the inmates who are in the class is in the exclusive control of Defendants MDOC, Lombardi, and Corizon. The class encompasses thousands of individuals under the custody of MDOC, who are geographically dispersed throughout the State of Missouri. The number of persons who are members of the class described above are so numerous that joinder of all members in one action is impracticable.

131.     Because the Class seeks prospective relief only, questions of law and fact that are common to the entire Class predominate over individual questions because the actions of Defendants MDOC, Lombardi, and Corizon complained of herein were generally applicable to the entire class. These legal and factual questions include, but are not limited to:

A. Whether Defendants MDOC, Lombardi, and Corizon maintain a policy or custom of withholding treatment with DAA drugs from individuals in the custody of MDOC who have been or will be diagnosed with HCV;

B. Whether the policy and custom of MDOC, Lombardi, and Corizon of withholding treatment with DAA drugs from individuals in the custody of MDOC who have been diagnosed with HCV constitutes deliberate indifference to a serious medical need; and

C. Whether the policy and custom of MDOC, Lombardi, and Corizon of withholding treatment with DAA drugs from individuals in the custody of MDOC who have been diagnosed with HCV discriminates based on their diagnosis in that MDOC, Lombardi, and Corizon do not have a custom or policy of withholding life-saving treatment from inmates with illnesses other than HCV.

132. Plaintiffs' claims for prospective relief are typical of the members of the class because Plaintiffs and all class members are subject to ongoing harm by the same wrongful policy and custom of Defendants MDOC, Lombardi, and Corizon of withholding treatment from them. Plaintiffs' claims arise from the same practices and course of conduct that give rise to the claims of the class members, and they are based on the same legal theories.

133. Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs have no interests that are contrary to or in conflict with those of the Class they seek to represent. Plaintiffs are represented by competent and skilled counsel whose interests are fully aligned with the interests of the Class.

134. Relief concerning Plaintiffs' rights under the laws herein alleged and with respect to the Class would be proper. Defendants MDOC, Lombardi, and Corizon have acted or refused

to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with regard to Class Members as a whole and certification of the Class under Rule 23(b)(2) proper.

## CLAIMS

### COUNT I
*Class-Action Claim for Prospective Relief for*
*Deprivation of Eighth Amendment Right to Medical Care*
**(Plaintiff Class against Defendants Lombardi and Corizon)**

135. Plaintiffs incorporate all preceding paragraphs as if fully set forth herein.

136. Defendants' acts and omissions in failing to provide adequate medical care, and delaying care, constitute deliberate indifference to the serious medical needs of prisoners infected with HCV, and they thereby violate the Eighth Amendment to the United States Constitution.

WHEREFORE, Plaintiffs pray this Court:

   A. Issue a declaratory judgment that Defendants Lombardi and Corizon's policy of withholding treatment with DAA drugs from inmates diagnosed with HCV violates the Eighth and Fourteenth Amendments of the United States Constitution;

   B. Enter preliminary and permanent injunctions directing that: (a) Defendants Lombardi and Corizon formulate and implement an HCV treatment policy that meets the prevailing standard of care, including identifying persons with HCV; (b) Defendants Lombardi and Corizon treat members of the Class with appropriate DAA drugs; and (c) Defendants Lombardi and Corizon provide members of the class an appropriate and accurate assessment of the level of fibrosis or cirrhosis they have, counseling on drug-drug interactions, and

25

ongoing medical care for complications and symptoms of HCV; and (d) any

further appropriate injunctions to prevent the future deprivation of rights of

members of the plaintiff class;

C. Award Plaintiffs' costs, including reasonable attorneys' fees under 42 U.S.C.

§ 1988 and other relevant provisions of law; and

D. Allow such other and further relief to which Plaintiffs may be entitled.

**COUNT II**
*Class-Action Claim for Prospective Relief for*
*Violation of the Americans with Disabilities Act*
**(Plaintiff Class against Defendant MDOC)**

137. Paragraphs 1–136 are incorporated as if fully set forth herein.

138. Subtitle A of Title II of the Americans with Disabilities Act (ADA) prohibits

public entities from discriminating against persons with disabilities in their programs, services,

and activities. 42 U.S.C. §§ 12131–12134. Regulations implementing subtitle A are codified at

28 C.F.R. part 35.

139. Title II's definition of "public entity" includes any state or local government or

"any department, agency . . . or other instrumentality" of a state or local government. 42 U.S.C.

§ 12131(1)(A), (B).

140. Defendant MDOC is a "public entity" within the meaning of 42 U.S.C.

§ 12131(1)(A) and 28 C.F.R. § 35.104.

141. Each member of the Class has a disability within the meaning of 42 U.S.C.

§ 12102(1) and 28 C.F.R. § 35.104.

142. Each member of the Class is "a qualified individual with a disability" within the

meaning of 42 U.S.C. § 12131(2) and 28 C.F.R. § 35.104 because they meet the essential

eligibility requirements for the receipt of services or the participation in programs or activities

26

provided by MDOC other than the fact that they require reasonable modifications to rules, policies, or practices, the removal of barriers, or the provision of auxiliary aids and services.

143.    MDOC subjects members of the Class to discrimination by withholding medically appropriate treatment that will likely cure their disability, although MDOC does not without life-saving treatments from individuals with different disabilities. This denial of treatment and discrimination violates 42 U.S.C. § 12132 (and the regulations promulgated under it - 28 C.F.R. Part 35) which states: "Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."

144.    As a result of Defendant MDOC's violations of the ADA and its implementing regulations, Defendant MDOC is liable to Plaintiffs for injunctive and declaratory relief pursuant to 42 U.S.C. § 12133.

WHEREFORE, Plaintiffs pray this Court:

A.  Issue a declaratory judgment that Defendant MDOC's policy of withholding treatment with DAA drugs from inmates diagnosed with HCV violates the Americans with Disabilities Act;

B.  Enter preliminary and permanent injunctions directing that: (a) Defendant MDOC formulate and implement an HCV treatment policy that meets the prevailing standard of care, including identifying persons with HCV; (b) Defendant MDOC treat members of the Class with appropriate DAA drugs; and (c) Defendant MDOC provide members of the class an appropriate and accurate assessment of the level of fibrosis or cirrhosis they have, counseling

on drug-drug interactions, and ongoing medical care for complications and symptoms of HCV; and (d) any further appropriate injunctions to prevent the future deprivation of rights of members of the plaintiff class.

C. Award Plaintiffs' costs, including reasonable attorneys' fees under 29 U.S.C. § 794a and other relevant provisions of law; and

D. Allow such other and further relief to which Plaintiffs may be entitled.

### COUNT III
#### *Claim for Damages for*
#### *Deprivation of Eighth Amendment Right to Medical Care*
**(Plaintiff Postawko against Defendants Lombardi, Corizon, Pryor, Proctor, Hardman, Davison, Stieferman, Bredeman, Cofield, and Does I-III)**

145.    Paragraphs 1–106 and 135–136 are incorporated as if fully set forth herein.

146.    The acts and omissions of Defendants Pryor, Proctor, Hardman, Davison, Stieferman, Bredeman, Cofield, and Does I-III in failing to provide adequate medical care, and delaying care, to Plaintiff Postawko constitute deliberate indifference to the serious medical needs of prisoners infected with HCV, and they thereby violate the Eighth Amendment to the United States Constitution.

147.    At all times relevant, Plaintiff Postawko had a serious medical need for treatment of his HCV with DAA drugs.

148.    At all times relevant, Defendants Pryor, Proctor, Hardman, Davison, Stieferman, Bredeman, Cofield, and Does I-III were aware of Plaintiff Postawko's serious need for medical care.

149.    At all times relevant, Defendants Pryor, Proctor, Hardman, Davison, Stieferman, Bredeman, Cofield, and Does I-III acted with deliberate indifference, failed to provide the medical care, or failed to direct that the medical care be provided.

150.     As a direct result of the failure of Defendants Pryor, Proctor, Hardman, Davison, Stieferman, Bredeman, Cofield, and Does I-III to provide care or direct that care be given, Plaintiff Postawko was harmed.

151.     In addition, in their actions described herein, Defendants Pryor, Proctor, Hardman, Davison, Stieferman, Bredeman, Cofield, and Does I-III acted pursuant to and in accordance with the policy and custom of Defendants Lombardi and Corizon to withhold treatment with DAA drugs from persons diagnosed with HCV.

WHEREFORE Plaintiff Postawko prays this Court:

    A.  Award him compensatory damages;

    B.  Award his costs, including reasonable attorneys' fees under 42 U.S.C. § 1988 and other relevant provisions of law; and

    C.  Allow such other and further relief to which he may be entitled.

### COUNT IV
### *Claim for Damages for*
### *Violation of Americans with Disabilities Act*
### (Plaintiff Postawko against Defendant Missouri Department of Corrections)

152.     Paragraphs 1–106 and 135–151 are incorporated as if fully set forth herein.

    WHEREFORE Plaintiff Postawko prays this Court:

    A.  Award him compensatory damages;

    B.  Award Plaintiffs' costs, including reasonable attorneys' fees under 29 U.S.C. § 794a and other relevant provisions of law; and

    C.  Allow such other and further relief to which he may be entitled.

## COUNT V
### *Claim for Damages for*
### *Deprivation of Eighth Amendment Right to Medical Care*
**(Plaintiff Baker against Defendants Lombardi, Corizon, Aguilera, Stamps, Jones, Bredeman, Cofield, Rucker, Wilhite, Boley, Hardy, and Does I-III)**

153.     Paragraphs 1–99, 107–118, and 135–136 are incorporated as if fully set forth herein.

154.     The acts and omissions of Defendants Aguilera, Stamps, Jones, Bredeman, Cofield, Rucker, Wilhite, Boley, Hardy, and Does I-III in failing to provide adequate medical care, and delaying care, to Plaintiff Baker constitute deliberate indifference to the serious medical needs of prisoners infected with HCV, and they thereby violate the Eighth Amendment to the United States Constitution.

155.     At all times relevant, Plaintiff Baker had a serious medical need for treatment of his HCV with DAA drugs.

156.     At all times relevant, Defendants Aguilera, Stamps, Jones, Bredeman, Cofield, Rucker, Wilhite, Boley, Hardy, and Does I-III were aware of Plaintiff Baker's serious need for medical care.

157.     At all times relevant, Defendants Aguilera, Stamps, Jones, Bredeman, Cofield, Rucker, Wilhite, Boley, Hardy, and Does I-III acted with deliberate indifference, failed to provide the medical care, or failed to direct that the medical care be provided.

158.     As a direct result of the failure of Defendants Aguilera, Stamps, Jones, Bredeman, Cofield, Rucker, Wilhite, Boley, Hardy, and Does I-III to provide care or direct that care be given, Plaintiff Baker was harmed.

159.     In addition, in their actions described herein, Defendants Aguilera, Stamps, Jones, Bredeman, Cofield, Rucker, Wilhite, Boley, Hardy, and Does I-III acted pursuant to and

in accordance with the policy and custom of Defendants Lombardi and Corizon to withhold treatment with DAA drugs from persons diagnosed with HCV.

WHEREFORE Plaintiff Baker prays this Court:

    A.  Award him compensatory damages;

    B.  Award his costs, including reasonable attorneys' fees under 42 U.S.C.

        § 1988 and other relevant provisions of law; and

    C.  Allow such other and further relief to which he may be entitled.

<u>**COUNT VI**</u>
*Claim for Damages for*
*Violation of Americans with Disabilities Act*
**(Plaintiff Baker against Defendant Missouri Department of Corrections)**

160.    Paragraphs 1–99, 107–118, 135–144, and 153–159 are incorporated as if fully set forth herein.

WHEREFORE Plaintiff Baker prays this Court:

    A.  Award him compensatory damages;

    B.  Award Plaintiffs' costs, including reasonable attorneys' fees under 29

        U.S.C. § 794a and other relevant provisions of law; and

    C.  Allow such other and further relief to which he may be entitled.

<u>**COUNT VII**</u>
*Claim for Damages for*
*Deprivation of Eighth Amendment Right to Medical Care*
**(Plaintiff Jamerson against Defendants Lombardi, Corizon, Williams, Bredeman, Fipps, Campbell, Baker, Yates, Julie Unknown, and Does I-III)**

161.    Paragraphs 1–99, 119–126, and 135–136 are incorporated as if fully set forth herein.

162.    The acts and omissions of Defendants Williams, Bredeman, Fipps, Campbell, Baker, Yates, Julie Unknown, and Does I-III in failing to provide adequate medical care, and

31

delaying care, to Plaintiff Jamerson constitute deliberate indifference to the serious medical needs of prisoners infected with HCV, and they thereby violate the Eighth Amendment to the United States Constitution.

163.      At all times relevant, Plaintiff Jamerson had a serious medical need for treatment of his HCV with DAA drugs.

164.      At all times relevant, Defendants Williams, Bredeman, Fipps, Campbell, Baker, Yates, Julie Unknown, and Does I-III were aware of Plaintiff Jamerson's serious need for medical care.

165.      At all times relevant, Defendants Williams, Bredeman, Fipps, Campbell, Baker, Yates, Julie Unknown, and Does I-III acted with deliberate indifference, failed to provide the medical care, or failed to direct that the medical care be provided.

166.      As a direct result of the failure of Defendants Williams, Bredeman, Fipps, Campbell, Baker, Yates, Julie Unknown, and Does I-III to provide care or direct that care be given, Plaintiff Jamerson was harmed.

167.      In addition, in their actions described herein, Defendants Williams, Bredeman, Fipps, Campbell, Baker, Yates, Julie Unknown, and Does I-III acted pursuant to and in accordance with the policy and custom of Defendants Lombardi and Corizon to withhold treatment with DAA drugs from persons diagnosed with HCV.

WHEREFORE Plaintiff Jamerson prays this Court:

      A.  Award him compensatory damages;

      B.  Award his costs, including reasonable attorneys' fees under 42 U.S.C. § 1988 and other relevant provisions of law; and

      C.  Allow such other and further relief to which he may be entitled.

<u>**COUNT VIII**</u>
*Claim for Damages for*
*Violation of Americans with Disabilities Act*
**(Plaintiff Jamerson against Defendant Missouri Department of Corrections)**

168.     Paragraphs 1–99, 119–126, 135–144, and 161–67 are incorporated as if fully set forth herein.

WHEREFORE Plaintiff Jamerson prays this Court:

A.  Award him compensatory damages;

B.  Award Plaintiffs' costs, including reasonable attorneys' fees under 29
    U.S.C. § 794a and other relevant provisions of law; and

C.  Allow such other and further relief to which he may be entitled.

Respectfully submitted,

<u>/s/ Anthony E. Rothert</u>
Anthony E. Rothert, #44827
Jessie Steffan, #64861
American Civil Liberties Union
    of Missouri Foundation
454 Whittier Street
St. Louis, Missouri 63108
Phone: 314/652-3114
Fax: 314/652-3112
trothert@aclu-mo.org
jsteffan@aclu-mo.org

Gillian R. Wilcox, #61278
American Civil Liberties Union
    of Missouri Foundation
406 West 34th Street, Suite 420
Kansas City, Missouri 64111
Phone: (816) 470-9938
Facsimile: (314) 652-3112
gwilcox@alcu-mo.org

Mae C. Quinn, #61584
Amy E. Breihan, #65499
MACARTHUR JUSTICE CENTER AT ST. LOUIS
3115 South Grand Blvd., Suite 300
St. Louis, MO 63118
Phone: (314) 254-8540
Fax: (314) 254-8547
mae.quinn@macarthurjustice.org
amy.breihan@macarthurjustice.org

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing was filed electronically and served by operation of the CM/ECF system on all counsel of record on December 15, 2016.

/s/ Anthony E. Rothert