IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

MICHAEL POSTAWKO, et al.,            )
                                     )
            Plaintiffs,              )
                                     )
                                     )
        v.                           )        No. 2:16-cv-04219-NKL
                                     )
MISSOURI DEPARTMENT OF               )
CORRECTIONS, et al.,                 )
                                     )
            Defendants.              )

**ORDER**

Defendants Missouri Department of Corrections, Adrienne Hardy, and Anne L. Precythe move to dismiss all of Plaintiffs' claims against them. [Doc. 103]. For the following reasons, Defendants' motion to dismiss is granted in part and denied in part.

I.      **Background**[1]

Plaintiffs Michael Postawko, Christopher Baker, and Michael Jamerson are incarcerated in the Missouri Department of Corrections ("MDOC"). [Doc. 30, p. 3]. They filed this putative class action for claims arising out of what they allege to be inadequate medical care for their chronic Hepatitis C ("HCV") viral infections. [*Id.*]. They bring claims under 42 U.S.C. § 1983 and Title II of the Americans with Disabilities Act (ADA) against numerous defendants, including their prison treating physicians and nurses; prison officials who reviewed their

_____

[1] At the motion to dismiss stage, all of the plaintiffs' allegations are accepted as true and construed in the light most favorable to the plaintiffs. *Stodghill v. Wellston Sch. Dist.*, 512 F.3d 472, 476 (8th Cir. 2008).

grievances and requests for treatment; the MDOC; and Corizon, LLC, the healthcare provider for all MDOC facilities. [*Id.* at p. 4-9].

A. **Hepatitis C**

HCV is a viral infection that attacks the liver and causes its inflammation, referred to as hepatitis. [*Id.* at p. 9]. Hepatitis caused by HCV can significantly impair liver function and damage its crucial role in digesting nutrients, filtering toxins from the blood, and preventing disease. [*Id.*]. In turn, liver impairment can cause severe pain, fatigue, muscle wasting, difficulty or pain with urination, an increased risk of heart attacks, and other side effects. [*Id.*].

HCV can be either acute or chronic. [*Id.*]. A small percentage of people who are exposed to infected blood develop an acute infection that their body resolves without treatment. [*Id.*]. However, the majority of people who develop acute HCV, approximately 75 to 85 percent, go on to develop chronic HCV. [*Id.* at p. 10]. People with chronic HCV develop fibrosis of the liver, which is a process by which healthy liver tissue is replaced with scarring. [*Id.*]. Because scar tissue cannot perform the jobs of normal liver cells, fibrosis reduces liver function. [*Id.*].

When scar tissue begins to take over most of the liver, this extensive fibrosis is termed cirrhosis. [*Id.*]. Cirrhosis is irreversible, and it often causes additional painful complications, including arthritic pain throughout the body, kidney disease, jaundice, fluid retention with edema, internal bleeding, easy bruising, abdominal ascites, mental confusion, lymph disorders, widespread itching, and even more extreme fatigue. [*Id.*]. Because it can be difficult to determine exactly when significant hepatitis fibrosis becomes cirrhosis, most of these complications can occur before cirrhosis. [*Id.*]. Further, if these complications go untreated, some can cause death. [*Id.*]. At least half of all persons diagnosed with chronic HCV will develop cirrhosis or liver cancer, and between 70 and 90 percent will develop chronic liver

disease.  [*Id.*].  Each day without treatment increases a person's likelihood of developing chronic liver disease, fibrosis, cirrhosis, liver cancer, and death from liver failure.  [*Id.*].

At least 10 to 15 percent of the population under the supervision, care, and custody of the MDOC are infected with HCV.  [*Id.* at p. 11].  As of January 2015, the MDOC reported that it was treating 0.11 percent of HCV-positive inmates under its supervision, or 5 inmates out of 4,736 inmates with known HCV infections.  [*Id.*].

### B.        Standard of Care for HCV

For many years, there was no effective and safe treatment for HCV.  [*Id.*].  The standard treatment, which included the use of interferon and ribavirin medications, failed to cure most patients and was associated with adverse side effects, including psychiatric and autoimmune disorders.  [*Id.* at p. 12].  However, over the past four years, the Federal Drug Administration ("FDA") has approved eight new medications, called direct-acting antiviral drugs ("DAA drugs"), which work faster, cause fewer side effects, and are more effective.  [*Id.*].  Over 90 percent of patients treated with a DAA drug are cured.  [*Id.* at p. 14].

The CDC encourages health professionals to follow the evidence-based standard of care developed by the Infectious Diseases Society of America ("IDSA") and the American Association for the Study of Liver Diseases ("AASLD"), which constitutes the medical standard of care.  [*Id.*].  On July 6, 2016, these organizations updated the standard of care to recommend treating *all* persons with chronic HCV with DAA drugs.  [*Id.* at p. 15].  Benefits of treatment include an immediate decrease in liver inflammation, reduction in the progression of liver fibrosis and improvement in cirrhosis, a 70 percent reduction in the risk of liver cancer, and a 90 percent reduction in the risk of liver-related mortality.  [*Id.*].  Studies show that a delay in DAA drug treatment for HCV decreases the benefits associated with cure.  [*Id.*].

## C.    Methods for Determining Progression of Fibrosis/Cirrhosis

Health care providers use several methods to determine the advancement of an HCV-positive person's cirrhosis or fibrosis, including liver biopsy and APRI (AST to Platelet Ratio Index). [*Id.* at p. 16]. APRI is the use of a blood sample to determine the ratio of a certain enzyme in the blood, aspartate aminotransferase (AST), with (1) the usual amount of AST in the blood of a healthy person and (2) the number of platelets in the affected person's blood. [*Id.*]. When an APRI score is very high, it has good diagnostic utility in predicting severe fibrosis or cirrhosis, but low and mid-range scores miss many people who have significant fibrosis or cirrhosis. [*Id.*]. For example, in more than 90 percent of cases, an APRI score of at least 2.0 indicates that a person has cirrhosis. [*Id.* at p. 17]. However, more than half of all people with cirrhosis will not have an APRI score of at least 2.0. [*Id.*].

If a person has already been diagnosed with cirrhosis through some other means, such as liver biopsy, an APRI score is irrelevant and not necessary for measuring the progression of fibrosis. [*Id.*]. In addition, because the levels of AST and ALT in one's blood fluctuate from day to day, a decreased or normalized level does not mean the condition has improved, and even a series of normal readings over time may fail to accurately show the level of fibrosis or cirrhosis. [*Id.*]. Furthermore, the elevation levels of AST and ALT often fail to show an individual's current level of fibrosis or cirrhosis, and they often fail to predict the consequences of not treating that individual. [*Id.*]. Although ALT is found predominately in the liver and not all over the body like AST, and ALT is a more specific indicator of liver inflammation than AST, an APRI score relies only on AST without taking ALT into account. [Doc. 30, p. 17]. For all of these reasons, using an APRI score alone to determine the severity of a person's fibrosis or cirrhosis is not adequate or appropriate. [*Id.*].

**D. Defendants' HCV Treatment Policy within the MDOC**

Plaintiffs allege that Defendants Precythe, MDOC, and Corizon, LLC have the following policies or customs, all of which are contrary to the prevailing standard of care: (1) not providing DAA drug treatment to all inmates with HCV, or even all inmates with chronic HCV; (2) using an APRI score, which measures the progression of fibrosis or cirrhosis, to determine whether a person should be treated; (3) relying exclusively on APRI score to determine the stage of fibrosis or cirrhosis, rather than using other more accurate methods of determining its progression through liver biopsies, FIB-4, or FibroScan; (4) failing to consider providing treatment to HCV-positive inmates unless they have an APRI score above 2.0 that persists for several months, even though more than half of persons with cirrhosis will not have an APRI score at or above 2.0, and they know that AST levels are transient; (5) disregarding independent diagnoses of cirrhosis or significant hepatitis fibrosis in making their treatment decisions; and (6) basing treatment decisions on cost, rather than on need for treatment. [*Id.* at p. 17-18]. Plaintiffs further allege that these policies or customs have caused, and continue to cause, unnecessary pain and an unreasonable risk of serious damage to the health of HCV-positive inmates. [*Id.* at p. 18].

Contrary to the proper and necessary medical procedures and the standard of care, Defendants have repeatedly denied requests by Plaintiffs Postawko, Baker, and Jamerson, as well as by other members of the putative class, for DAA drug treatment for their HCV infections. [*Id.* at p. 19]. It is the policy of Defendants to classify inmates with known HCV infection as "Chronic Care Clinic Offenders." [*Id.*]. Rather than receiving treatment, these inmates receive a blood draw every six months and, at times, minimal counseling. [*Id.*]. Defendants also have a policy or custom of permitting "Chronic Care Clinic" visits with HCV-positive inmates to be

conducted by video so that there cannot be a visual and physical inspection of the liver, which is contrary to the prevailing standard of care. [*Id.*].

### E. Plaintiffs Postawko, Baker, and Jamerson's Claims

Plaintiff Michael Postawko became infected with HCV while under the care and supervision of the MDOC in or around 2012. [*Id.* at p. 20]. Every Defendant treater who Postawko has seen at the MDOC or who has reviewed his HCV-related complaints has refused to treat Postawko with DAA drugs, contrary to the prevailing standard of care. [*Id.*]. Postawko has symptoms consistent with HCV, including extreme fatigue to the point that brushing his teeth causes intense aching in his arm muscles; fever; abdominal pain; severe headaches; almost constant joint pain; and dark urine with what appear to be traces of blood. [*Id.*]. Postawko receives two medications for his severe headaches, sumatriptan and propranolol HCL, which are only about 60 percent effective. [*Id.*]. Postawko has not received any HCV treatment. [*Id.*].

In 2005, Plaintiff Christopher Baker was diagnosed with HCV, and in 2007, he underwent a liver biopsy and was diagnosed with cirrhosis. [*Id.* at p. 21]. In 2008, Baker was sentenced to ten years in the MDOC. [*Id.*]. In 2009, the MDOC began treating Baker with the then-prevailing treatment, interferon and ribavirin, which appeared to be working. [*Id.*]. However, after five months of treatment, the MDOC, through a provider named Dr. McKinney, informed Baker that the MDOC was no longer treating HCV-positive inmates with those drugs and discontinued Baker's course of treatment. [*Id.*].

Since early 2010, Baker has received no further treatment for HCV and has received no treatment at any time with a DAA drug. [*Id.*]. Each treater who Baker has seen at the MDOC or who has denied his HCV-related complaints, including Defendant Adrienne Hardy, has refused to treat him with DAA drugs, contrary to the prevailing standard of care. [*Id.*].

On March 2, 2016, while Baker was incarcerated at JCCC, an Informal Resolution Request response to Baker indicates that he was "placed on a spreadsheet" because he had an APRI score above 1.0, without regard to his pre-incarceration cirrhosis diagnosis, which was made based on a liver biopsy. [*Id.*]. Baker did not receive any treatment as a result of either his independent cirrhosis diagnosis or his placement on a spreadsheet. [*Id.*]. In July 2016, Baker was transferred from JCCC to Algoa Correctional Center where he no longer even appears on a list for treatment. [*Id.*]. Baker has symptoms consistent with HCV, including nausea, severe joint pain, fatigue, back and chest pain, tenderness in his liver area, and dark urine. [*Id.* at p. 22].

Plaintiff Michael Jamerson became infected with HCV while incarcerated at the MDOC. [*Id.*]. Jamerson has repeatedly requested treatment with DAA drugs. [*Id.*]. Although Jamerson is enrolled in the Chronic Care Clinic, he has not received any treatment with any DAA drug. [*Id.*]. Every medical provider Jamerson has seen at the MDOC or who has directed his course of treatment, has refused to treat him with DAA drugs, contrary to the standard of care. [*Id.*]. Jamerson has symptoms consistent with HCV, including fatigue; muscle and joint pain; stomach, liver, and chest pain; and tenderness in his liver area. [*Id.*].

Plaintiffs bring claims under the Eighth Amendment and the ADA, individually and on behalf of a putative class. Plaintiffs bring two claims on behalf of a putative class:

- Count I for prospective relief for deprivation of their Eighth Amendment rights against Precythe, in her official capacity, and Corizon, LLC; and
- Count II for prospective relief for violation of the ADA against the MDOC.

In addition, Plaintiffs Postawko, Baker, and Jamerson bring the following individual claims:

- Count III brought by Postawko for damages for deprivation of his Eighth Amendment rights against Precythe, in her official capacity; Corizon, LLC; and ten medical employees;
- Count IV brought by Postawko for damages for violation of the ADA against the MDOC.

- Count V brought by Baker for damages for deprivation of his Eighth Amendment rights against Precythe, in her official capacity; Corizon, LLC; and twelve medical employees, including Adrienne Hardy, a registered nurse and the director of nursing at JCCC;
- Count VI brought by Baker for damages for violation of the ADA against the MDOC.
- Count VII brought by Jamerson for damages for deprivation of his Eighth Amendment rights against Precythe, in her official capacity; Corizon, LLC; and ten medical employees; and
- Count VIII brought by Jamerson for damages for violation of the ADA against the MDOC.

## II.    Discussion

Defendants argue that Plaintiffs' Eighth Amendment claims (Counts I, III, V, and VII) should be dismissed because Plaintiffs fail to state a claim. In the alternative, Defendants contend that Plaintiffs' Eighth Amendment claims against MDOC Director Precythe (Counts III, V, and VII) are barred by the Eleventh Amendment. As to Baker's Eighth Amendment claim against Defendant Hardy (Count V), Defendants contend that Hardy is entitled to qualified immunity. Defendants argue that Plaintiffs' ADA claims (Counts II, IV, VI, and VIII) should be dismissed because they fail to state a claim. Additionally, Defendants contend that these claims are also barred by the Eleventh Amendment.

At the pleading stage, a plaintiff is not required to present detailed factual allegations. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009).

### A.    Eighth Amendment Claims: Counts I, III, V, and VII

In Counts I, III, V, and VII, Plaintiffs bring Eighth Amendment claims for deliberate indifference to their serious medical needs against the MDOC; MDOC Director Anne Precythe; Corizon, LLC; numerous individual medical staff, including doctors and nurses; and Adrienne

Hardy, a medical contract monitor and nurse. Defendants MDOC and Precythe move to dismiss these counts against them, arguing that Plaintiffs fail to state a claim under the Eighth Amendment because they have no constitutional right to obtain the particular course of Hepatitis C treatment that they demand.

The Eighth Amendment requires prison officials to provide inmates with proper medical care. *Estelle v. Gamble*, 429 U.S. 97, 103 (1976); *see also Crooks v. Nix*, 872 F.2d 800, 804 (8th Cir. 1989) ("Where a prisoner needs medical treatment prison officials are under a constitutional duty to see that it is furnished."). To prevail on a claim of constitutionally inadequate medical care, the plaintiff inmate must show that the defendants "act[ed] with deliberate indifference to the prisoner's serious medical needs." *Bender v. Regier*, 385 F.3d 1133, 1137 (8th Cir. 2005) (quoting *Estelle*, 429 U.S. at 104). Such claims have both an objective component and a subjective component. *Dulaney v. Carnahan*, 132 F.3d 1234, 1239 (8th Cir. 1997). Specifically, the plaintiff must show (1) that he had an objectively serious medical need and (2) that prison officials subjectively knew of, but deliberately disregarded, that need. *Id.*

### 1. Serious Medical Need

Plaintiffs plausibly allege that they have a serious medical need, the first requirement for their Eighth Amendment claims. A "serious medical need" is "one that has been diagnosed by a physician as requiring treatment, or one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Coleman v. Rahija*, 114 F.3d 778, 784 (8th Cir. 1997) (quoting *Cambreros v. Branstad*, 73 F.3d 174, 176 (8th Cir. 1995)). "When an inmate alleges that a delay in medical treatment constituted a constitutional deprivation, 'the objective seriousness of the deprivation should also be measured by reference to the effect of delay in treatment.'" *Id.* (citing *Crowley v. Hedgepeth,* 109 F.3d 500, 502 (8th Cir. 1997)).

In their Complaint, Plaintiffs allege that they have been diagnosed with HCV, which the Eighth Circuit has characterized as being "unquestionably a serious medical problem." *Bender v. Regier*, 385 F.3d 1133, 1137 (8th Cir. 2004). Plaintiffs allege that left untreated, HCV causes pain and lasting bodily harm, including fibrosis and cirrhosis of the liver and, in the vast majority of cases, chronic liver disease. The Complaint further provides that cirrhosis is irreversible and can cause additional painful complications, including among other complications, kidney disease, jaundice, internal bleeding, fluid retention with edema, mental confusion, and extreme fatigue.

Defendants respond by citing *Bender v. Regier*, 385 F.3d 1133, 1137 (8th Cir. 2004), which held that "the Eighth Amendment issue is not whether the infection itself is a 'serious medical need,' but rather whether [the plaintiffs] had a serious medical need for prompt [treatment with DAAs]." As to this issue, Plaintiffs allege that treatment with direct-acting antiviral drugs, which were first made available in 2013, produces more than a 90 percent cure rate. They further allege that the current prevailing standard of care, as established by the Infectious Diseases Society of America ("IDSA") and American Association for the Study of Liver Diseases ("AASLD"), mandates treatment of *all* persons with chronic HCV with a DAA drug. Plaintiffs plead that despite their HCV diagnoses, they do not receive any treatment for their HCV infections, aside from a blood draw every six months and at times, minimal counseling. Furthermore, they plead that delay in treatment with one of the available DAA drugs increases their likelihood of developing chronic liver disease, fibrosis, cirrhosis, liver cancer, painful complications, and death from liver failure. Finally, Plaintiffs allege that they suffer individual complications from their chronic HCV infections, including extreme fatigue, abdominal pain, severe headaches, dark urine with what appear to be traces of blood, severe joint

pain, back and chest pain, and tenderness in the area of their livers. In addition, Plaintiff Baker alleges that despite being independently diagnosed with cirrhosis in 2010 via liver biopsy, a more accurate indicator than APRI score, he does not receive any HCV treatment. In light of these assertions, Plaintiffs' Complaint plausibly alleges that Plaintiffs have a serious medical need for prompt treatment with DAAs.

### 2. Deliberate Indifference

Plaintiffs also plausibly allege the second requirement that Defendants subjectively knew of, but deliberately disregarded, their serious medical need for treatment. "Deliberate indifference entails a level of culpability equal to the criminal law definition of recklessness: disregarding a known risk to the inmate's health." *Allard v. Baldwin*, 779 F.3d 768, 772 (8th Cir. 2015) (internal quotation marks removed). Mere malpractice of medicine in prison does not amount to an Eighth Amendment violation. *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). In other words, "an *inadvertent* failure to provide adequate medical care," such as "a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a claim." *Id.* (emphasis added); *see also, Harrison v. Barkley*, 291 F.3d 132, 139 (2d Cir. 2000) (explaining that "[t]his principle [from *Estelle*] may cover a delay in treatment based on a bad diagnosis or erroneous calculus of risks and costs, or a mistaken decision not to treat based on an erroneous view that the condition is benign or trivial or hopeless, or that treatment is unreliable, or that the cure is as risky or painful or bad as the malady."). In contrast, "refus[ing] treatment of a properly diagnosed condition that [i]s progressively degenerative, potentially dangerous and painful, and that could be treated easily and without risk . . . is not 'mere medical malpractice.'" *Harrison*, 219 F.3d at 139.

"A plaintiff can show deliberate indifference in the level of care provided in different ways, including by showing grossly incompetent or inadequate care," *Smith v. Jenkins*, 919 F.2d 90, 93 (8th Cir. 1990), showing a defendant's decision to take an easier and less efficacious course of treatment, *id.*, or showing a defendant intentionally delayed or denied access to medical care, *Meloy v. Bachmeier*, 302 F.3d 845, 849 (8th Cir. 2002)." *Allard v. Baldwin*, 779 F.3d 768, 772 (8th Cir. 2015). Although mere medical negligence—an inadvertent failure to provide adequate medical care—does not violate the Eighth Amendment, "medical treatment may so deviate from the applicable standard of care as to evidence a physician's deliberate indifference" in violation of the Eighth Amendment. *Moore v. Duffy*, 255 F.3d 543 (8th Cir. 2001). In addition, "[i]n institutional level challenges to prison health care . . . systemic deficiencies can provide the basis for a finding of deliberate indifference." *Harris v. Thigpen*, 941 F.2d 1495, 1505 (11th Cir. 1991). For example, "a series of incidents closely related in time may disclose a pattern of conduct amounting to deliberate indifference." *Id.* (internal quotations omitted). Further, "[r]epeated examples of delayed or denied medical care may indicate a deliberate indifference by prison authorities to the suffering that results." *Id.*

In this case, Plaintiffs' Complaint plausibly alleges that Defendants deliberately disregarded and continue to disregard Plaintiffs' serious medical need for DAA drug treatment. Defendants are aware of the availability and efficacy of DAA drugs. Defendants know that the applicable standard of care calls for treating *all* patients suffering from chronic HCV with those DAA drugs, regardless of their cirrhosis/fibrosis progression or APRI score, and that a delay in treatment with DAA drugs increases the risks of HCV progression as well as decreases the benefits of DAA treatment. However, despite this awareness, Defendants follow a policy or custom that categorically denies DAA drug treatment to inmates with chronic HCV. Under this

policy, Defendants do not even *consider* treating inmates with chronic HCV with DAA drugs unless and until those inmates have APRI scores above 2.0 that persist for several months.[2] Defendants follow this policy despite the following alleged facts: more than half of all people with cirrhosis will not have an APRI score of at least 2.0; APRI scores fluctuate from day to day, and an improvement in APRI score does not mean the condition has improved; an APRI score obtained from a blood draw is only one of several methods used to determine the progression of an individual's fibrosis/cirrhosis; and the standard of care is to treat an individual with chronic HCV with a DAA drug, regardless of his APRI score. As a result of this policy, Plaintiffs' Complaint further alleges that as of January 2015, the MDOC reported that it was treating with DAA drugs only 0.11 percent of all of its HCV-positive inmates, which equates to approximately five inmates out of 4,736 inmates with known HCV infections.

As alleged in Plaintiffs' Complaint, this "wait and see" policy of relying solely on APRI scores and delaying DAA treatment until the disease has progressed to a far more serious level contravenes the applicable medical standard of care without any medical justification.[3] *See, e.g., Abu-Jamal v. Wetzel*, 2017 WL 34700, at *15, quoting *Monmouth Cty. Corr. Ins. Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987) ("Deliberate indifference is also evidenced where prison officials erect arbitrary and burdensome procedures that result in interminable delays and

---

[2] As alleged in Plaintiffs' Complaint and discussed in Section I.C., an APRI score is obtained from a blood sample and provides the ratio of a particular enzyme with platelets in the affected person's blood. Measuring one's APRI score is one method used to determine the progression of a person's fibrosis/cirrhosis. The APRI score method has good diagnostic utility in predicting severe fibrosis or cirrhosis when the APRI score is very high. However, the test is underinclusive in that low and mid-range APRI scores miss many people who have significant fibrosis or cirrhosis. For example, more than half of all people with cirrhosis will not have an APRI score of at least 2.0.

[3] In addition to this policy or custom lacking any medical justification, Plaintiffs also allege that it results in treatment decisions based on cost, rather than on medical need, which only further suggests that the condition imposed on treatment is likely an arbitrary and unreasonable one.

outright denials of medical care to suffering inmates.").  Because chronic HCV is a progressive disease and delay in treatment with DAA drugs reduces the benefits associated with treatment, Defendant's policy causes unnecessary and wanton infliction of pain and increases the risk of serious damage to the health of those inmates suffering from chronic HCV.  Taken as true, these facts plausibly allege a deliberate disregard for Plaintiffs' serious medical needs for DAA treatment in violation of the Eighth Amendment.  *See, e.g., Abu-Jamal v. Wetzel*, 2017 WL 34700, at *15 (M.D. Pa. Jan. 3, 2017) (finding reasonable likelihood of success on deliberate indifference prong where defendant prison followed policy of choosing a course of monitoring over DAA treatment for non-medical reasons and allowing the HCV-positive inmate's condition to worsen while his liver function and health continued to deteriorate before even considering treatment with DAA drugs); *Harrison v. Barkley*, 219 F.3d 132, 138 (2d Cir. 2000) (holding that both "outright refusal of any treatment for a degenerative condition that tends to cause acute infection and pain if left untreated" and the "imposition of a seriously unreasonable condition on such treatment" constitute deliberate indifference by prison officials).

Plaintiffs have plausibly alleged more than mere medical malpractice—an *inadvertent* failure to provide adequate medical care.  For instance, their denied access to DAA treatment is not the result of a misdiagnosis; they have been properly diagnosed with chronic HCV, for which the medical standard of care calls for DAA drug treatment.  *Cf. Allard v. Baldwin*, 779 F.3d 768, 772 (8th Cir. 2015) (finding inmate who was misdiagnosed with constipation and given extensive treatment for that diagnosis but where his proper diagnosis was for a bowel obstruction did not show deliberate indifference by prison because the delay in proper treatment was the result of negligent misdiagnosis, not actual knowledge of his condition coupled with denial of proper treatment).  Further, Defendants' decision to deny DAA treatment to Plaintiffs is not

"based on an erroneous view that the condition is benign or trivial or hopeless, or that treatment is unreliable, or that the cure is as risky or painful or bad as the malady." *Harrison v. Barkley*, 291 F.3d 132, 139 (2d Cir. 2000). Plaintiffs' chronic HCV condition is a serious and harmful medical condition, which risks increasingly serious liver damage, among other bodily harms, to those who have it. Plaintiffs are not denied DAA treatment "based on an erroneous view that . . . treatment is as risky or painful or bad as the malady" because DAA drug treatment is reliable, safe, and highly effective with a 90 percent cure rate for those infected with HCV. *Id.* Finally, Plaintiffs do not allege entitlement to some novel or cutting-edge course of treatment that constitutes something more than that required by the applicable standard of care. Instead, they have alleged that they are categorically denied access to the proper treatment for their HCV— DAA drug treatment—which is *the* medical standard of care as recommended by the CDC, IDSCA, and AASLD. *See also Abu-Jamal v. Wetzel*, 2017 WL 34700, at *15 (M.D. Pa. Jan. 3, 2017) ("[T]he standard of care as established by the CDC and AASLD for treatment of patients with hepatitis C is the use of DAA medications. . . . The DOC's own expert [] agreed that the same standard of care as to hepatitis C treatment that is applicable to the community at large should apply in a correctional setting . . . and [t]hus, the standard of care for treating Plaintiff is to administer DAA medications").

Defendants respond in part by asking the Court to take judicial notice of what they qualify as "indisputable facts," including that HCV is "typically an extremely slow-acting disease" and that "the large majority of HCV-positive persons will never suffer any serious adverse effects from the disease." [Doc. 127, p. 3, n.1]. However, even if true, these facts do not justify as a matter of law Defendants' policy of categorically denying the proper treatment to inmates with chronic HCV by imposing an arbitrary condition on that treatment unsupported by

medical justification. Defendants appear to suggest that because not *every* inmate infected with chronic-HCV will definitely suffer "serious adverse effects" from the disease, then treatment is not warranted. But, in contrast to Defendants' contention, Plaintiffs are not required to suffer "imminent, life threatening circumstances" in order to allege deliberate indifference. *See, e.g., Harrison v. Barkley*, 219 F.3d 132, 139 (2d Cir. 2000) (denying qualified immunity for prison doctor who refused to treat cavity in one tooth unless inmate consented to extraction of another infected tooth, which was also diseased but which he wished to keep) (characterizing the doctor's refusal of treatment as more than mere medical malpractice because he had "refuse[d] treatment of a properly diagnosed condition that was progressively degenerative, potentially dangerous and painful, and that could be treated easily and without risk"). Merely "opting for an easier and less efficacious treatment of the inmate's condition" by adopting a monitoring policy instead of treatment and waiting to see just how much the inmate's health may deteriorate is not permissible. *See, e.g., Abu-Jamal*, 2017 WL 34700, at *14 (rejecting prison's HCV fibrosis/cirrhosis monitoring and prioritization policy and stating that defendants "may not, with deliberate indifference to the serious medical needs of the inmate, opt for an easier and less efficacious treatment of the inmate's condition") (quoting *Monmouth Cty. Corr. Inst. Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987)); *see also Smith v. Jenkins*, 919 F.2d 90, 93 (8th Cir. 1990) (quoting same).

Next, Defendants argue that Plaintiffs' Eighth Amendment claims must fail because Defendants do monitor and "treat" inmates with HCV, as well as provide "clinical care." [Doc. 104, p. 13 of 19]. However, as discussed above, Plaintiffs' Complaint plausibly alleges that the medical care they have received is inadequate: what Defendants have categorized as "medical care" is limited to a policy of monitoring through blood draws every six months in order to track

Plaintiffs' APRI scores, as well as the provision of "minimal counseling" and classification of Plaintiffs as "Chronic Care Clinic Offenders." Any additional medical treatment alleged in the Complaint is limited to Defendants having prescribed two medications for Plaintiff Postawko's severe headaches, not his HCV. The previous medical treatment pointed to by Defendants is akin to "mere proof of medical care," which is not enough to disprove deliberate indifference. *See Smith v. Jenkins*, 919 F.2d 90, 93 (8th Cir. 1990). Because Plaintiffs have plausibly alleged that the medical care they receive falls well below the applicable standard of care without any medical justification, they are "entitled to prove their case by establishing [the] course of treatment, or lack thereof, so deviated from professional standards that it amounted to deliberate indifference." *Id.*

Furthermore, at least one district court has already considered and rejected as inadequate a similar monitoring policy for inmates with chronic HCV, but in the context of an inmate plaintiff's motion for preliminary injunction. *Abu-Jamal v. Wetzel*, 2017 WL 34700, at *16 (M.D. Pa. Jan. 3, 2017). In *Abu-Jamal*, a district court in the Third Circuit granted the plaintiff inmate's motion for preliminary injunction to require the prison defendants to immediately treat his HCV with DAA drugs. *Id.* at *20. Similar to the case before this Court, the *Abu-Jamal* prison defendants followed a policy of barring from consideration for DAA treatment those inmates with chronic HCV who did not have severe fibrosis or cirrhosis. *Id.* at *15. Specifically, if an HCV positive inmate was considered for treatment, the prison would order shear wave elastography to determine the inmate's fibrosis progression. *Id.* If the test indicated a fibrosis level of F0, F1, or F2, the policy required the inmate to receive monitoring but did not permit treatment with DAAs. *Id.* Accordingly, inmates with mild or moderate fibrosis had no

chance of receiving DAA drugs until their HCV had worsened, which effectively meant that their HCV had to worsen before they would even be considered for treatment. *Id.*

The *Abu-Jamal* court found the plaintiff inmate had a reasonable likelihood for success on the merits as to his Eighth Amendment claim. *Id.* at *18. In analyzing the deliberate indifference prong, the district court characterized the prison's policy as suffering from a "fatal flaw": "refus[ing] without medical justification to provide treatment for certain inmates with hepatitis C and also impos[ing] an unreasonable condition—having vast fibrosis or cirrhosis—on treatment." *Id.* The district court further reasoned that this case was not a mere disagreement with the course of care, nor was it an inadvertent failure to provide adequate medical care. *Id.* Instead, the court concluded that the plaintiff "has shown that the DOC has implemented a policy that categorically denies certain inmates with chronic hepatitis C from receiving the curative treatment that the DOC's own expert testified he would recommend for a non-prisoner with the same condition." *Id.* The court went on to conclude that the plaintiff had shown that the defendants deliberately denied providing treatment to inmates with a serious medical condition and choosing a course of monitoring instead "with the knowledge that (1) the standard of care is to administer DAA medications regardless of the disease's stage, (2) inmates would likely suffer from hepatitis C complications and disease progress without treatment, and (3) the delay in receiving DAA medications reduces their efficacy." *Id.*

Like in *Abu-Jamal*, the Plaintiffs in this case have alleged facts indicating that Defendants refuse to treat the vast majority of inmates suffering from chronic HCV and that they have imposed an unreasonable condition on qualification for treatment: advanced fibrosis/cirrhosis sufficient to indicate an APRI score of over 2.0 for several months. Despite an effective and near-certain cure in the form of DAA drugs, Defendants follow a prioritization and

monitoring policy, which prolongs the suffering of those diagnosed with chronic HCV and allows the progression of the disease to accelerate. As in *Abu-Jamal*, such a policy is enough to show deliberate indifference, particularly at the current pleading stage.

Defendants also argue that Plaintiffs fail to state a claim because they fail to "allege that no *other* course of treatment for HCV would meet the minimal standards of the Eighth Amendment" and thus, "they have not alleged a 'serious medical need' for DAA drugs in particular." [Doc. 104, p. 11 of 19]. Although it is true that inmates "have no constitutional right to receive a particular course of treatment" so long as they receive adequate treatment, Defendants' characterization of Plaintiffs' claims as being a mere disagreement over their particular course of treatment fails to take into account Plaintiffs' allegations. [Doc. 127, p. 2, citing *Dulaney v. Carnahan*, 132 F.3d 1234, 1239 (8th Cir. 1997)]; *see also, Warren v. Fanning*, 950 F.2d 1370, 1373 (8th Cir. 1991) ("[A] mere disagreement with the course of the inmate's medical treatment does not constitute an eighth amendment claim of deliberate indifference.").

As already discussed, Plaintiffs allege that they are not receiving any "course of medical treatment" for their HCV, except for monitoring through blood draws and minimal counseling. Plaintiffs do not allege a mere dispute about which HCV medication they receive, but instead, they allege that they do not receive any HCV medication. Nor, for example, do Plaintiffs allege a mere disagreement with a physician's decision to not provide a particular treatment for an individual inmate due to contraindications particular to that inmate. *Cf. Holloway v. Correctional Med. Svcs.*, 2010 WL 908491, at *6-7 (E.D. Mo. Mar. 9, 2010) (finding no deliberate indifference where prison doctor's decision to deny HCV-positive inmate interferon treatment until he completed a drug treatment program was consistent with NIH and FBOP guidelines at the time and represented mere disagreement with the course of his treatment).

Instead, as discussed at length above, the import of Plaintiffs' Complaint is that Defendants do not have a medical reason for deviating from the applicable standard of care, which calls for treating them with DAA drugs.

Moreover, whether the medical "care" Plaintiffs receive is constitutionally adequate is a merits issue and accordingly, a determination more appropriate for summary judgment or trial, not a motion to dismiss. For this reason, too, the cases cited by Defendants are not persuasive because they each involve a court's decision as to the merits of the plaintiff inmate's Eighth Amendment claims on summary judgment. *See, e.g.*, *Long v. Nix*, 86 F.3d 761 (8th Cir. 1996) (appeal on summary judgment); *Harris v. Thigpen*, 941 F.2d 1495 (11th Cir. 1991) (same).

The Court also rejects Defendants' separate contention that the Eighth Circuit and other federal courts "routinely dismiss[] claims by prisoners demanding a specific course of drug treatment for HCV, as well as similar infections." [Doc. 104, p. 12 of 19]. The cases cited by Defendants are distinguishable because at the time they were decided, there was no effective, safe treatment for HCV, and DAA drugs were not yet available. According to Plaintiffs' Complaint, until the recent advent and approval of DAA drugs, there was *no* effective and safe treatment for HCV. Historically, treatment generally included the use of interferon and ribavirin medications, which failed to cure most patients and were contraindicated for patients with psychiatric and autoimmune disorders. Therefore, Defendants' remaining cases are distinguishable because they were decided prior to the approval of DAA drugs for HCV treatment when the only HCV treatments available were far less effective, as well as when the medical standard of care was different from the one applicable today. *See generally Bender v. Regier*, 385 F.3d 1133 (8th Cir. 2004) (ruling only as to qualified immunity, describing treatments available in 2004 and intervening changes to the state department of health protocol,

commenting that individual HCV-positive inmate was not eligible for treatment because of other factors, and declining to address the district court's holding that inmate had "serious medical need for prompt interferon treatment"); *Black v. Ala. Dep't of Corrs.*, 578 F. App'x 794 (11th Cir. 2014) (per curiam) (affirming summary judgment for prison officials in *pro se* case where it was undisputed that inmate had "not suffer[ed] any negative health consequences from not being in the Hepatitis C Treatment Program"); *Free v. Unknown Officers of the Bureau of Prisons*, 103 F. App'x 334 (10th Cir. 2004) (long before DAA drugs were available, holding that *pro se* prisoner had failed to exhaust his administrative remedies but alternatively affirming, in dictum, that prison officials had followed recommendations from National Institutes of Health); *Edmonds v. Robbins*, 67 F. App'x 872 (6th Cir. 2003) (unpublished) (holding that prison official was not liable under Eighth Amendment where *pro se* HCV-positive inmate was examined monthly, sent to hospital for outside testing, and the outside medical doctors and submitted medical literature all agreed that medication was not necessary); *Hollis v. Dep't of Corrs.*, 560 F. Supp. 2d 920 (C.D. Cal. 2008) (holding in individual case where no symptoms were present that *pro se* HCV-positive inmate was not entitled to interferon/ribavirin in part because "therapy is not universally effective"); *Dotson v. Wilkinson*, 477 F. Supp. 2d 838 (N.D. Ohio 2007) (holding in an individual case that *pro se* HCV-positive inmate was not entitled to interferon/ribavirin because he had high blood pressure and elevated creatinine levels that rendered him ineligible for treatment under medical protocols).

Finally, the Court also rejects Defendants' separate argument that Plaintiffs fail to state a claim because they "do not allege the MDOC Defendants are personally responsible for treating them or for managing their HCV" and thus, "fail to state any plausible claim of individual indifference to their HCV." [Doc. 104, p. 11 of 19]. "Where a prisoner needs medical treatment

prison officials are under a constitutional duty to see that it is furnished." *Crooks v. Nix*, 872 F.2d 800, 804 (8th Cir. 1989) (citing *Estelle v. Gamble*, 429 U.S. 97, 103 (2006)). In their Complaint, Plaintiffs allege that the Defendants who have moved to dismiss—the MDOC and MDOC Director Precythe—implemented, authorized, or condoned the treatment policies described previously, which plausibly makes them liable despite the fact that these Defendants did not personally treat or manage Plaintiffs' HCV. *See id.* ("[A] § 1983 claimant may maintain a theory of direct liability against a prison or other official if that official fails to properly train, supervise, direct or control the actions of a subordinate who causes the injury."). Therefore, Plaintiffs' Complaint "sufficiently allege[s] inadequate prison policies or medical supervision which, if true, would result in these defendants being held liable just as if they had refused to deliver those services themselves." *Id.*

For the previous reasons, Defendants' motion to dismiss is denied with respect to Plaintiffs' Eighth Amendment claims, Counts I, III, V, and VII.

### B. Eighth Amendment Claims against Precythe: Counts III, V, and VII

In Counts III, V, and VII, Plaintiffs bring claims for damages under the Eighth Amendment against Defendant MDOC Director Anne Precythe in her official capacity. However, the Eleventh Amendment bars claims against the State of Missouri and its agencies in federal courts. *Quern v. Jordan*, 440 U.S. 332, 337 (1979); *Murphy v. State of Arkansas*, 127 F.3d 750, 754 (8th Cir. 1997). Claims alleged against state officials in their official capacity are analyzed as claims against the state. *Kentucky v. Graham*, 473 U.S. 159, 169 (1985).

Defendants argue that because these claims for damages are brought against Director Precythe in her official capacity, they are claims against the state and are therefore barred. Plaintiffs concede that the Eleventh Amendment bars these claims and abandon them against

Precythe, only, without prejudice to later filing such claims against Precythe in her individual capacity. Therefore, the Court dismisses with prejudice Counts III, V, and VII, only as against Director Precythe in her official capacity.

### C. Eighth Amendment Claim against Hardy: Count V

Plaintiff Baker's Count V asserts a claim for damages under the Eighth Amendment against several defendants, including MDOC Defendant Adrienne Hardy. Defendants contend that this claim must be dismissed against Hardy because she is entitled to qualified immunity.

"To overcome the defense of qualified immunity, a plaintiff must show: (1) the facts, viewed in the light most favorable to the plaintiff, demonstrate the deprivation of a constitutional or statutory right; and (2) the right was clearly established at the time of the deprivation." *Howard v. Kansas City Police Dep't*, 570 F.3d 984, 988 (8th Cir. 2009). The Court may exercise its "sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *McRaven v. Sanders*, 577 F.3d 974, 980 (8th Cir. 2009) (quoting *Pearson v. Callahan*, 555 U.S. 223, 235 (2009)).

In support of his claim against Hardy, Baker alleges the following facts, which must be construed in his favor. Defendant Hardy is a registered nurse working as a medical contract monitor at Jefferson City Correctional Center. Hardy knew that Baker suffered from chronic HCV, that he was not receiving HCV treatment, and that he required treatment with a DAA drug. Hardy did not intervene, provide care, or direct that care be given to Baker. Instead, Hardy denied Baker's grievance to her for DAA treatment for his chronic HCV on the grounds that he was being seen by a doctor and was enrolled in the Chronic Care Clinic.

Defendants argue that Hardy is entitled to qualified immunity because she reasonably relied on Baker's treating physician's opinion, and "[a] prison official may rely on a medical professional's opinion if such reliance is reasonable." *McRaven v. Sanders*, 577 F.3d 974, 981 (8th Cir. 2009) (citing *Meloy v. Bachmeier* 302 F.3d 845, 849 (8th Cir. 2002) ("The law does not clearly require an administrator with less medical training to second-guess or disregard a treating physician's treatment decision."); *see also Johnson v. Doughty,* 433 F.3d 1001, 1010 (7th Cir. 2006) ("Except in the unusual case where it would be evident to a layperson that a prisoner is receiving inadequate or inappropriate treatment, prison officials may reasonably rely on the judgment of medical professionals.")).

The Eighth Circuit addressed a similar situation in *Meloy v. Bachmeier*, 302 F.3d 845 (8th Cir. 2002). In *Meloy*, an inmate brought an Eighth Amendment claim against Bachmeier, a nurse who worked as the prison's director of medical services. *Id.* at 847. The inmate alleged that despite his request for treatment for his obstructive sleep apnea, treatment which Bachmeier knew he was not receiving, Bachmeier denied his request because she relied on his treating doctor's orders that the requested treatment was unnecessary. *Id.*

The Eighth Circuit reversed the district court's denial of qualified immunity, holding that Bachmeier's reliance on the treating doctor's order was objectively reasonable. *Id.* at 849. The Eighth Circuit concluded that although Bachmeier had training as a nurse, she was functioning in an administrative role and was not personally responsible for examining and treating the inmate. *Id.* Although the inmate told Bachmeier about his condition and need for the specific treatment, Bachmeier relied on the opinion of his treating physicians, who had more medical training about the necessary treatment for the inmate's condition. *Id.* The Eighth Circuit reasoned that this meant Bachmeier was not personally involved in an Eighth Amendment violation. *Id.* As to her

liability as a supervisor, the Eighth Circuit concluded that the law "does not clearly require an administrator with less medical training to second-guess or disregard a treating physician's treatment decision." *Id.*

In the same way, Defendant Hardy is a nurse by training but is alleged to have been functioning in an administrative role as a medical contract monitor. Baker does not allege that Hardy personally treated him for his chronic HCV or that she was responsible for treating him.[4] Rather, the Complaint alleges that in failing to intervene as well as denying Baker's grievance for DAA treatment, Hardy knew Baker was enrolled in the Chronic Care Clinic, and that she deferred to the orders of Baker's doctors. As in *Meloy*, "the law does not clearly require an administrator [like Hardy] with less medical training to second-guess or disregard a treating physician's treatment decision." *Meloy*, 302 F.3d at 849. Therefore, Hardy is entitled to qualified immunity.

Although Plaintiffs cite *McRaven v. Sanders*, 577 F.3d 974 (8th Cir. 2009), in support of their contention that Hardy's deference to Baker's treating physicians does not excuse her from liability, *McRaven* does not support Plaintiffs' position. In *McRaven*, defendant jail officials who denied treatment to an inmate claimed that they were entitled to qualified immunity because they had relied on a nurse's assessment in denying the inmate treatment. *Id.* at 980-82. Although the jail officials deferred to the nurse's medical assessment, the jail officials were aware of a cocktail of potent drugs that the inmate had consumed; that the circumstances strongly suggested the inmate did not consume them in prescribed dosages; that the inmate

---

[4] Plaintiffs note, "Defendants assert that Hardy was not responsible for treating Plaintiff Baker, [but] . . . [t]his fact is outside the pleadings, and therefore should not be considered by the Court in ruling on the pending motion." [Doc. 123, p. 15 of 24]. Although Plaintiffs' argument is technically correct, Plaintiffs do not allege that Hardy was responsible for personally treating Baker anywhere in their Complaint, and therefore, this fact was not pled, which the Court can take into account in ruling on the pending motion.

exhibited symptoms of extreme intoxication; and that the nurse based her assessment of the inmate on the assumption that he was under the influence of alcohol, not drugs. *Id.* The Eighth Circuit held that because the jail officials had such relevant personal knowledge about the inmate's condition, knowledge which they knew the nurse did *not* have, the jail officials' reliance on the nurse's assessment was not objectively reasonable, and thus, they were not entitled to qualified immunity. *Id.*

Unlike in *McRaven*, Baker's Complaint does not allege that Hardy had any personal knowledge superior to or different from the knowledge of Baker's treating doctors or the professionals seeing Baker in the Chronic Care Clinic. Therefore, the fact that Hardy is alleged to have denied Baker's grievance in reliance on the opinion of Baker's doctors was objectively reasonable and not a clearly established violation of Baker's constitutional rights. Accordingly, Count V is dismissed with respect to Defendant Hardy because she is entitled to qualified immunity.[5]

### D.     ADA Claims: Counts II, IV, VI, and VIII

Defendants argue that Counts II, IV, VI, and VIII should be dismissed for failure to state a claim because medical treatment decisions cannot be challenged under the ADA. In addition, they contend that Counts IV, VI, and VIII are barred by the Eleventh Amendment.

#### 1.  Medical Treatment Decisions under the ADA

Plaintiffs allege that Defendant MDOC discriminates against inmates with chronic HCV in violation of the ADA by withholding medically appropriate treatment that will likely cure their disability while, at the same time, Defendant does not withhold lifesaving treatments from individuals with disabilities other than chronic HCV. [Doc. 30, p. 27, ¶ 143]. Under Title II of

_____

[5] Count V is the only claim asserted against Defendant Adrienne Hardy.

the ADA, 42 U.S.C. § 12131 *et seq.,* a qualified individual with a disability may not be excluded from participation in or be denied benefits of services, programs, or activities of a public entity, or be subjected to discrimination by that entity, because of the individual's disability. A qualified individual with a disability is a person who "meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by the public entity." 42 U.S.C. § 12131(2).

To prevail on a Title II ADA claim, a plaintiff must establish: (1) that he is a person with a disability as defined by statute; (2) that he is otherwise qualified for the benefit in question; and (3) that he was excluded from the benefit because of discrimination based upon his disability. *See* 42 U.S.C. § 12131 *et seq.; Randolph v. Rodgers,* 170 F.3d 850, 857 (8th Cir. 1999). Defendants focus solely on the third factor and argue that within the Eighth Circuit, claims under the ADA "cannot be based on medical treatment decisions," which Defendants contend is all that Plaintiffs' claims allege. *Burger v. Bloomberg,* 418 F.3d 882, 883 (8th Cir. 2006). In *McElroy v. Patient Selection Committee*, 2007 WL 4180695, at *2 (D. Neb. Nov. 21, 2007), *aff'd per curiam,* 2009 WL 50176 (8th Cir. Jan. 9, 2009), the district court cited this principle in granting summary judgment for defendants on the inmate plaintiff's ADA claim. The court found that the evidence undisputedly showed that the inmate, who had a history of mental illness, was denied a kidney transplant for a legitimate medical reason: his mental illness was a contraindication for transplants. *Id.*

Plaintiffs concede that medical treatment decisions cannot be challenged under the ADA, but they argue that they are not challenging mere inadequate medical treatment decisions. Rather, Plaintiffs contend that they challenge Defendant MDOC's policy or custom of denying DAA drug treatment to most inmates suffering chronic HCV, which effectively prohibits

medical professionals from making independent medical decisions about whether to provide such treatment. Plaintiffs argue that this policy or custom discriminates against them by denying them lifesaving treatments for HCV where Defendant MDOC does provide lifesaving treatments to inmates with disabilities other than HCV. *Cf. Bryant v. Madigan*, 84 F.3d 246, 249 (7th Cir. 1996) (finding inmate failed to state an ADA claim where inmate alleged prison failed to adequately attend to his medical needs but where inmate did not allege discrimination or that he was treated worse "because of" his disability); *Moore v. Kohl*, 2005 WL 2002084, at *2-3 (dismissing inmate's ADA claims against two doctors and their assistant because his claims related only to the refusal of those defendants to exercise their professional judgment in accordance with the plaintiff's views of his medical needs).

The Court agrees. Claims of inadequate medical treatment for a disability are distinguishable from claims that a prisoner was denied access to medical services because of his disability. Although not directly on point, *McNally v. Prison Health Services*, 46 F. Supp. 2d 49 (D. Me. 1999), illustrates this distinction. In *McNally*, an HIV-positive individual was arrested and held in jail. *Id.* at 51. He alleged that he informed jail personnel that he needed his HIV medication, but they denied his access to it. *Id.* McNally brought an ADA claim alleging that the jail's policy regarding providing prescribed medications to inmates was different for inmates with HIV. *Id.* at 58-59. The jail argued that this claim failed as a matter of law because it alleged only that the inmate received poor medical treatment, which could not be challenged under the ADA. *Id.* at 58. However, the district court rejected this argument, noting, "Plaintiff has contended that Cumberland County Jail discriminated against Plaintiff because of his HIV-positive status, not by providing him with inadequate care, but by denying him immediate access to prescribed medications, a service provided to detainees in need of prescriptions for other

illnesses." *Id.* The court continued by noting that the record before it showed that the jail had one policy for detainees taking HIV medication and one for detainees on medication for maladies other than HIV. *Id.* at 58-59.

Similarly, Plaintiffs in this case allege that they are denied access to lifesaving medications, a service provided to inmates with other illnesses. Construing the Plaintiffs' Complaint in the light most favorable to them, Plaintiffs do not merely allege inadequate medical treatment, but instead, they allege that Defendant MDOC follows one policy for inmates with chronic HCV and another policy for inmates with other disabilities under which they do receive lifesaving medications. Defendant MDOC contends that *McNally* is distinguishable because Plaintiffs challenge the "treatment protocols themselves" and "are not challenging discriminatory access to a prison service that provides them with *already prescribed* medication as in *McNally.*" [Doc. 127, p. 10 (emphasis in original)]. The Court is not persuaded that the medications having already been prescribed in *McNally* makes *McNally* less applicable to the facts at hand. Furthermore, by virtue of challenging the "treatment protocols themselves," as Defendant MDOC contends, Plaintiffs do challenge discriminatory access to the prison's services because they allege a policy under which they are not provided access to lifesaving medications for their disability while inmates with other disabilities do have access to lifesaving medications.

Therefore, at least, at the present motion to dismiss stage, Plaintiffs' Complaint plausibly alleges claims under the ADA. *See also, e.g., Rogers v. Mo. Dep't of Corrections*, 2011 WL 13051907 (W.D. Mo. Aug. 2, 2011) (rejecting prison's argument that disabled inmate's ADA claims for prison's refusal to provide him with an electric wheelchair "must be dismissed to the extent that they are based on a medical treatment decision" because the Complaint alleged a policy decision by the prison, not a medical treatment decision, and it would be improper for the

court to assume that fact); *Madden v. Mo. Dep't of Corrs.*, 2011 WL 3101926, at \*2 (W.D. Mo. July 25, 2011) (denying motion to dismiss ADA claim in part because the record lacked allegations that the defendants' decision to deny inmate the use of an electric wheelchair was a medical treatment decision).

Authorities cited by Defendants are distinguishable from the facts before this Court. Defendants' authorities involve situations where individual plaintiffs simply disagreed with medical treatment decisions and did not challenge a prison's general policy or custom, as Plaintiffs do here. *See, e.g., Dinkins v. Mo. Dep't of Corrs.*, 743 F.3d 633, 634 (8th Cir. 2014) (affirming dismissal of inmate's ADA claims where inmate did not challenge a general policy but rather challenged individual medical treatment decisions, including not properly diagnosing and treating his pernicious anemia).

Other cases cited by Defendants are also distinguishable because they were not decided at the motion to dismiss stage, and in contrast to the present case, the courts in Defendants' cases were presented with actual evidence as to whether the plaintiffs were discriminated against "because of" their alleged disabilities. In each of these cases, the defendants had an opportunity to present evidence contrary to the allegations made by the plaintiffs, which in turn, empowered the court to consider the record as a whole and whether a question remained for the jury. However, at the current stage of the litigation, this Court is bound by the allegations in Plaintiffs' Complaint and does not yet have any contrary evidence to consider that would contradict Plaintiffs' allegations. *Cf., Simmons v. Navajo Cty., Ariz.*, 609 F.3d 1011, 1021-22 (9th Cir. 2010) (affirming district court's granting of summary judgment for prison where there was no evidence that inmate's exclusion from outdoor recreation was "because of" his depression, as an alleged disability, and therefore, his exclusion did not support ADA claim); *Jordan v. Delaware*,

433 F. Supp. 2d 433, 438-443 (D. Del. 2006) (granting summary judgment for prison on inmate's ADA claim for denial of a liver biopsy where evidence did not show that inmate was treated differently "because of" his HCV status and where evidence showed the prison followed screening and treatment guidelines developed by the Federal Bureau of Prisons and the NIH); *Iseley v. Beard*, 200 F. App'x 137, at *4 (3rd Cir. 2006) (affirming district court's granting of summary judgment for *pro se* prison on inmate's ADA claim where inmate "claim[ed] that he was denied medical treatment for his disabilities, which is not encompassed by the ADA's prohibitions" and where he did not argue that he was excluded from any program "because of" his disability).

### 2. Sovereign Immunity under the Eleventh Amendment

Defendant MDOC contends that Plaintiffs Postawko, Baker, and Jamerson's individual ADA claims against it for monetary damages in Counts IV, VI, and VIII must additionally be dismissed because these claims are barred by the Eleventh Amendment.[6] Plaintiffs contend that with respect to their ADA claims for damages against MDOC, Congress has validly abrogated Missouri's Eleventh Amendment immunity.

Generally, sovereign immunity under the Eleventh Amendment applies to bar damage suits against the State and its agencies unless Congress abrogates sovereign immunity through its ability to enforce the substantive provisions of the Fourteenth Amendment. *United States v. Georgia*, 546 U.S. 151, 158 (2006). The Supreme Court has held that Title II of the ADA validly abrogates sovereign immunity for conduct that is in itself unconstitutional. *Klingler v. Director, Dep't of Revenue*, 455 F.3d 888, 93 (8th Cir. 2006) (citing *United States v. Georgia*,

---

[6] Plaintiffs first respond that they also seek prospective relief in these counts and that there is no basis for dismissing their claims insofar as they seek prospective relief. However, Plaintiffs' Complaint states only that it is a "Claim for Damages," not prospective relief. *See* [Doc. 30, p. 29, 31, and 33].

546 U.S. 151, 158 (2006)). Therefore, "insofar as Title II [of the ADA] creates a private cause of action for damages against the States for conduct that *actually* violates the Fourteenth Amendment, Title II validly abrogates state sovereign immunity." *Id.*

Under the framework set out by the Supreme Court in *Georgia*, whether sovereign immunity bars claims under Title II of the ADA is addressed on a "claim-by-claim basis" and requires an assessment of "(1) which aspects of the State's alleged conduct violated Title II; (2) to what extent such misconduct also violated the Fourteenth Amendment; and (3) insofar as such misconduct violated Title II, but did not violate the Fourteenth Amendment, whether Congress's purported abrogation of sovereign immunity as to that class of conduct is nevertheless valid." *Id.* at 892 (citing *Georgia*, 546 U.S. at 159).

First, the Court considers which aspects of the State of Missouri's alleged conduct violated Title II and to what extent this misconduct also violated the Fourteenth Amendment. The Fourteenth Amendment commands that "all persons similarly situated should be treated alike." *Tennessee v. Lane*, 541 U.S. 509, 522 (internal citations omitted). As to their ADA claims, Plaintiffs allege that they have been treated differently than inmates who do not have HCV. Specifically, by denying Plaintiffs the opportunity to access medical services on an equal basis as persons who are not diagnosed with HCV, the State of Missouri denies them equal protection in violation of the Fourteenth Amendment.

In addition, and as already addressed, Plaintiffs plausibly allege deliberate indifference to their serious medical needs in violation of the Eighth Amendment, which is incorporated by the Fourteenth Amendment. *See Georgia*, 546 U.S. at 157 (holding that plaintiff's claims for money damages against the State under Title II of the ADA were largely based on conduct that independently violated the Eighth Amendment). Therefore, as in *Georgia*, Defendant MDOC's

alleged violations of Plaintiffs' Eighth Amendment rights also state a claim for violation of the Fourteenth Amendment, actionable through Title II of the ADA. *Georgia*, 546 U.S. at 159 ("[I]nsofar as Title II creates a private cause of action for damages against the States for conduct that *actually* violates the Fourteenth Amendment, Title II validly abrogates state sovereign immunity."). Because Plaintiffs have alleged Title II claims that are based on actual violations of the Fourteenth Amendment, Congress validly authorized their ADA claims for damages using its power under Section 5 of the Fourteenth Amendment.

## III.    Conclusion

For the previous reasons, Defendants MDOC, Adrienne Hardy, and Anne Precythe's motion to dismiss, Doc. 103, is granted in part and denied in part. The motion is granted as to Defendant Precythe in her official capacity in Counts III, V, and VII; these claims are dismissed against Defendant Precythe in her official capacity with prejudice. The motion is also granted as to Defendant Hardy, only, in Count V. Dismissal is denied for the remainder of Plaintiffs' claims.


                                                            /s/ Nanette K. Laughrey
                                                            NANETTE K. LAUGHREY
                                                            United States District Judge


Dated:  May 11, 2017
Jefferson City, Missouri