**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MISSOURI**
**CENTRAL DIVISION**

| | | |
|---|---|---|
| MICHAEL G. POSTAWKO, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No.    2:16-CV-04219 NKL |
| | ) | |
| MISSOURI DEPARTMENT OF | ) | |
| CORRECTIONS, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**SUGGESTIONS IN SUPPORT OF PLAINTIFFS'**
**MOTION FOR PRELIMINARY INJUNCTION**

1

# Table of Contents

I. INTRODUCTION .................................................................................................. 6

II. STATEMENT OF FACTS ................................................................................... 8

   A. Chronic HCV is serious and potentially deadly, but curable................................. 8

   B. The standard of care for chronic HCV infection is well established and calls for treating nearly all patients with DAA drugs. ............................................................................ 10

   C. Defendants' HCV policies and practices wholly fail to comply with the prevailing standard of care............................................................................................................ 15

   D. Defendants are knowingly denying life-saving treatment to thousands of inmates with chronic HCV. .................................................................................................................. 19

III. LEGAL STANDARD ......................................................................................... 19

IV. ARGUMENT ....................................................................................................... 21

   A. Plaintiffs are likely to succeed on the merits .................................................... 21

      1. *Plaintiffs' chronic HCV is a serious medical need.* ..................................... 22

      2. *Defendants knew of, but deliberately disregarded (and continue to disregard), Plaintiffs' serious medical need.* .................................................................................... 23

      3. *Defendants' deliberate disregard caused (and continues to cause) Plaintiffs to suffer injury.* ........................................................................................................................... 25

      4. *Recent decisions establish Plaintiffs' likelihood of success* ......................... 26

   B. Plaintiffs face a substantial threat of serious, irreparable harm ........................ 28

   C. The balance of harms militates in favor of a preliminary injunction................. 28

   D. The public interest supports granting an injunction........................................... 29

V. CONCLUSION ..................................................................................................... 30

## Table of Authorities

*Abu-Jamal v. Wetzel*
  2017 WL 34700 (M.D. Pa. Jan. 3, 2017) .................................................................. 7, 22, 26, 27

*Amos v. Higgins*
  996 F. Supp. 2d 810 (W.D. Mo. 2014) ...................................................................... 20

*Church Mutual Ins. Co. v. Sands*
  2014 WL 3907831 (W.D. Mo. Aug. 11, 2014) ............................................................ 20

*Coleman v. Rahija*
  114 F.3d 778 (8th Cir. 1997) ..................................................................................... 21, 22, 23

*Costello v. Wainwright*
  397 F. Supp. 20 (M.D. Fla. 1975) .............................................................................. 30

*Crooks v. Nix*
  872 F.2d 800 (8th Cir. 1989) ..................................................................................... 21

*Cuna Mut. Ins. Soc'y*
  611 F.3d 79 (1st Cir. 2010) ....................................................................................... 21

*Dataphase Sys., Inc. v. C L Sys., Inc.*
  640 F.2d 109 (8th Cir. 1981) ..................................................................................... 20

*Estate of Snyder v. Julian*,
  No. 1:11-cv-00024, 2013 WL 4042195 (E.D. Mo. Aug. 8, 2013) ............................. 21

*Estelle v. Gamble*
  429 U.S. 97 (1976) .................................................................................................... 21

*Gibson v. Weber*
  433 F.3d 642 (8th Cir. 2006) ..................................................................................... 21

*Grayson v. Ross*
  454 F.3d 802 (8th Cir. 2006) ..................................................................................... 21

*H&R Block Tax Servs., LLC v. Clayton*
  2016 WL 1247205 (W.D. Mo. Mar. 24, 2016) ........................................................... 20

*Hilton v. Wright*
  928 F. Supp. 2d 530 (N.D.N.Y. 2013) ....................................................................... 23

*Hoffer v. Jones*
  290 F. Supp. 3d 1292 (N.D. Fla. 2017) .............................................................. *passim*

*Kahle v. Leonard*
477 F.3d 544 (8th Cir. 2007) ........................................................................ 23

*Kai v. Ross*
336 F.3d 650 (8th Cir. 2003) ........................................................................ 29

*Langford v. Norris*
614 F.3d 445 (8th Cir. 2010) ........................................................................ 24

*Laube v. Haley*
234 F. Supp. 2d 1227 (M.D. Ala. 2002) ................................................. 28, 29

*M.B. v. Corsi*
2018 WL 5504178 (W.D. Mo. Oct. 29, 2018) ......................................... 7, 28

*McRaven v. Sanders*
577 F.3d 974 (8th Cir. 2009) ........................................................................ 24

*Meuir v. Greene Cty. Jail Employees*
487 F.3d 1115 (8th Cir. 2007) ...................................................................... 21

*Moore v. Duffy*
255 F.3d 543 (8th Cir. 2001) ........................................................................ 24

*Nelson v. Corr. Med. Servs.*
583 F.3d 522 (8th Cir. 2009) (en banc ......................................................... 21

*PCTV Gold, Inc. v. SpeedNet, LLC*
508 F.3d 1137 (8th Cir. 2007) ...................................................................... 20

*Planned Parenthood Minn., N.D., S.D. v. Rounds*
530 F.3d 724 (8th Cir. 2008) ................................................................... 20, 22

*Prosser v. Nagaldinne,*
No. 4:09-cv-2117, 2011 WL 5975902 (E.D. Mo. Nov. 30, 2011) ............. 24

*Schaub v. VonWald*
638 F.3d 905 (8th Cir. 2011) ................................................................... 22, 23

*Smith v. Jenkins*
919 F.2d 90 (8th Cir. 1990) .......................................................................... 24

*Stafford v. Carter*
2018 WL 4361639 (S.D. Ind. Sept. 13, 2018) ..................................... *passim*

4

*Univ. of Texas v. Camenisch*
  451 U.S. 390 (1981) ..................................................................................................... 20

*Vaughn v. Greene Cty.*
  438 F.3d 845 (8th Cir. 2006) ...................................................................................... 21

# I. INTRODUCTION

At least 4,590 inmates in the custody of the Missouri Department of Corrections have been diagnosed with chronic hepatitis C virus ("HCV"). *See* MDOC Resps. to Pls.' Second Set of Interrogs., attached hereto as Plaintiffs' **Exhibit 1**. HCV is curable but, if left untreated, can lead to (among other things) permanent liver damage, cancer, and death. For that reason, the medical community has been in consensus for years that treatment with direct-acting antiviral ("DAA") medication is the medically appropriate treatment for nearly all people with chronic HCV infections. But Defendants' policies and customs regarding HCV treatment deviate dramatically from the standard of care. As of February 26, 2019, Defendants were providing DAA treatment to only 15 inmates—less than 0.5% of those infected with chronic HCV. *Id.* What's more, just 169 of the remaining 4,575 were categorized by MDOC as so-called "priority one" and placed on a waitlist for treatment. *Id.* Individuals not designated "priority one" are periodically monitored without treatment until their bodies have been irreparably damaged by the disease. *See* Affidavit of Dr. Thomas Bredeman, ECF No. 114-1 and attached hereto as Plaintiffs' **Exhibit 2**, at ¶ 14.

Defendants' inadequate care amounts to a deliberate, sustained failure to properly treat inmates with chronic HCV. By ignoring the serious medical needs of thousands of people in their custody and care, Defendants have jeopardized the health of Plaintiffs and the community at large. For years—both before the filing of the operative complaint in December 2016 and during the pendency of Defendants' appeal to the Eighth Circuit—Plaintiffs have suffered greatly because of Defendants' refusal to implement constitutionally adequate policies for the treatment of chronic HCV. Some have even died. But the harm is not limited to Plaintiffs. Defendants' policies also put other MDOC inmates, MDOC employees, and ultimately the general public at unnecessary risk of infection and its consequences.

6

The Eighth Circuit has affirmed certification of a class of individuals "in the custody of MDOC, now or in the future, who have been, or will be, diagnosed with chronic HCV, as that term is defined medically, but who are not provided treatment with direct acting antiviral drugs." *See* ECF No. 215. The time has now come to mitigate the suffering of the class ("Plaintiffs"). Plaintiffs are entitled to preliminary injunctive relief because each of the *Dataphase* factors weighs heavily in their favor. *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109 (8th Cir. 1981) (en banc).

*First*, Plaintiffs are likely to prevail on the merits of their constitutional claim. Indeed, three federal district courts have recently upheld Eighth Amendment challenges to correctional departments' refusals to treat inmates' chronic HCV. *See Stafford v. Carter*, No. 1:17-cv-00289, 2018 WL 4361639 (S.D. Ind. Sept. 13, 2018) (granting summary judgment in favor of a class of inmates); *Hoffer v. Jones*, 290 F. Supp. 3d 1292 (N.D. Fla. 2017) (granting preliminary injunction in favor of class of inmates); *Abu-Jamal v. Wetzel*, 2017 WL 34700 (M.D. Pa. Jan. 3, 2017) (granting preliminary injunction in favor of inmate).

*Second*, absent an injunction, Plaintiffs will suffer ongoing, irreparable harm to their health because Defendants refuse to create and implement medically appropriate policies regarding treatment for chronic HCV. *See*, *e.g.*, *M.B. v. Corsi*, No. 2:17-cv-04102, 2018 WL 5504178, at *5 (W.D. Mo. Oct. 29, 2018) (describing threats to constitutional rights and danger to health as irreparable harms and collecting cases).

*Third*, the balance of harms militates in favor of granting an injunction. The continued threat of significant adverse health consequences to Plaintiffs, and ultimately to the community at large, far outweighs any burden providing treatment would place on Defendants.

*Fourth*, an injunction is in the public interest. Protection of constitutional rights is always in the public interest, and immediate relief would ensure not just the protection of Plaintiffs' constitutional rights but also alleviate ongoing physical and psychological harm. In addition, an injunction would minimize the significant, unnecessary public health risk inherent in leaving HCV untreated: spread of the disease within the correctional setting and, as infected individuals are released from prison, outside of it.

For these reasons, the Court should grant Plaintiffs' motion for a preliminary injunction.

## II.     STATEMENT OF FACTS

### A.  Chronic HCV is serious and potentially deadly, but curable.

HCV is a viral infection that attacks the liver and causes inflammation, which is referred to as hepatitis. Ex. 2, Bredeman Aff., ¶ 4; *CDC Fact Sheet: Viral Hepatitis and Liver Cancer*, ECF No. 132-7 and attached hereto as Plaintiffs' **Exhibit 3**, at 2; Declaration of Dr. Richard Moseley, attached hereto as **Exhibit 4**, at ¶¶ 2–3. Hepatitis caused by HCV can significantly impair liver function and prevent the liver from fulfilling its crucial role in digesting nutrients, filtering toxins from the blood, and preventing disease. *See* Declaration of Dr. Blair Thedinger, attached hereto as **Exhibit 5**, at ¶¶ 21–22; *see also* AASLD/IDSA HCV GUIDELINES ("HCV GUIDELINES"), attached hereto as **Exhibit 6**, at 30–41.[1] HCV infection leads to chronic HCV infection in approximately 80% of patients. Ex. 4, Dr. Moseley Decl., ¶ 3.

Chronic HCV infection causes serious liver damage and painful, sometimes deadly complications. *See* Ex. 4, Dr. Moseley Decl., ¶ 3. People with chronic HCV develop fibrosis of the liver, a process in which healthy liver tissue is replaced with scarring. Ex. 5, Dr. Thedinger

---

[1] The Guidelines are evidence based and expert developed, and they represent the current medical standard of care. *See* Ex. 5, Dr. Thedinger Decl., ¶¶ 3–4. They are regularly updated and publicly available at https://www.hcvguidelines.org/.

Decl., ¶ 8; Ex. 2, Dr. Bredeman Aff., ¶¶ 7–8; Ex. 3, *CDC Fact Sheet*, at 2. Because scar tissue cannot perform the tasks of normal liver cells, fibrosis reduces liver function. Ex. 5, Thedinger Decl. ¶¶ 21–22; Ex. 2, Dr. Bredeman Aff., ¶ 8. Extensive fibrosis, where scar tissue takes over much of the liver, is called cirrhosis. Ex. 2, Dr. Bredeman Aff., ¶¶ 7–8. Patients with chronic HCV often suffer from serious and painful complications, including liver cancer, joint pain, kidney disease, jaundice, fluid build-up in the legs or abdomen, internal bleeding, diabetes mellitus, lymph disorders, and extreme fatigue. Ex. 5, Dr. Thedinger Decl., ¶¶ 21–22; Ex. 4, Dr. Moseley Decl., ¶ 3; Ex. 2, Dr. Bredeman Aff., ¶¶ 7, 17, 20; Ex. 6, HCV GUIDELINES, at 26, 33.[2] However, the liver disease of individuals with chronic HCV can progress even while a person is asymptomatic. Ex. 5, Dr. Thedinger Decl., ¶ 13; *see also* Ex. 6, HCV GUIDELINES, at 33 ("Fibrosis progression varies markedly between individuals based on host, environmental, and viral factors. Fibrosis may not progress linearly.") (internal citations omitted). All patients with HCV face substantial risk of progression of liver fibrosis, non-liver related complications, and negative effects on quality of life. Ex. 5, Dr. Thedinger Decl., ¶ 22.

Chronic HCV infections kill more Americans than any other infectious disease, and it has been the leading indication for liver transplants in the United States. "Hepatitis C Kills More Americans than Any Other Infectious Disease," CDC, May 4, 2016, attached hereto as Plaintiffs' **Exhibit 20**; Ex. 3, *CDC Fact Sheet*, at 1, 2. In addition, it is highly communicable, especially in correctional settings. Ex. 5, Dr. Thedinger Decl., ¶¶ 15–16; Ex. 4, Dr. Moseley Decl., ¶ 2; Ex. 2, Dr. Bredeman Decl., ¶ 16; Ex. 6, HCV GUIDELINES, at 210. Failure to treat chronic HCV in correctional settings poses a public health threat not only to those within the prison walls,

---

[2] *See also Hoffer*, 290 F. Supp. 3d at 1299 (stating that the plaintiff class members "all suffer from chronic HCV" and, as a result, "are faced with substantial risks of serious harm, including, but not limited to, bleeding from any site in the body, accumulation of fluid in the legs or abdomen, life-threatening infections, significant pain or discomfort, organ failure, liver cancer, and death").

including prison personnel, but also to those outside of prisons, because the vast majority of people in custody eventually return to the general population. Ex. 4, Dr. Moseley Decl., ¶ 10; Beckman et al., *New Hepatitis C Drugs Are Very Costly and Unavailable To Many State Prisoners*, HEALTH AFFAIRS 35 (2016), at 1899, ECF No. 132-2 and attached hereto as Plaintiffs' **Exhibit 7** (hereinafter, Beckman 2016); Ex. 3, *CDC Fact Sheet*, at 2; Ex. 6, HCV GUIDELINES, at 210.

Fortunately, despite the serious, sometimes life-threatening symptoms and complications of chronic HCV, the vast majority of hepatitis C infections are curable. Ex. 4, Dr. Moseley Decl., ¶¶ 3, 5; *see also* Beckman 2016, at 1893–94. Individuals who have been cured of HCV can no longer transmit the virus to others unless they are re-infected. Ex. 5, Dr. Thedinger Decl., ¶ 15; Ex. 3, *CDC Fact Sheet*, at 2–3; Ex. 6, HCV GUIDELINES, at 30, 205.

### B. The standard of care for chronic HCV infection is well established and calls for treating nearly all patients with DAA drugs.

The current prevailing medical standard of care for persons with chronic HCV infection, developed by the Infectious Diseases Society of America (IDSA) and the American Association for the Study of Liver Disease (AASLD), is to provide treatment with DAA drugs for all patients, "except those with a short life expectancy that cannot be remediated by HCV treatment, liver transplantation, or another directed therapy." Ex. 4, Dr. Moseley Decl., ¶ 4; *see also* Declaration of Dr. Jody Olson, attached hereto as Plaintiffs' **Exhibit 8**, at ¶¶ 6–9; Ex. 5, Dr. Thedinger Decl., ¶¶ 3–8; Ex. 2, Dr. Bredeman Aff., ¶ 10.

The standard of care is articulated by the IDSA and AASLD's evidence-based, expert-developed guidelines for HCV care and management, which are available for all medical providers through their regularly updated website http://www.hcvguidelines.org. *See generally* Ex. 6, HCV GUIDELINES.

The medical standard of care, as reflected by the guidelines, also addresses how HCV is identified and diagnosed. The identification of an active HCV infection requires blood testing, which is typically done in two steps: first, HCV antibody screening shows if a person has been ever been exposed to the hepatitis C virus; second, RNA or "viral load" testing for persons with positive antibody screens shows whether the virus is active. *Id.* at 17. Viral load testing is required to make a proper diagnosis of a current HCV infection. Ex. 4, Dr. Moseley Decl., ¶ 3; Ex. 6, HCV GUIDELINES, at 16–18. The CDC directs health care professionals to do "everything possible" to follow the evidence-based standards promulgated by AASLD/IDSA. Ex. 3, *CDC Fact Sheet*, at 3; *see also* Ex. 5, Dr. Thedinger Decl., ¶ 4; Ex. 4, Dr. Moseley Decl., ¶ 4; Ex. 8, Dr. Olson Decl., ¶¶ 6–7.

The medical standard of care has progressed toward universal treatment in the years since the introduction of DAA drugs. When the AASLD/IDSA guidelines were first updated, shortly after the first DAA drug was approved in 2013, they provided "prioritization tables" and guidance on selecting patients with the greatest need because the "infrastructure . . . . did not yet exist to treat all patients immediately." Ex. 5, Dr. Thedinger Decl., ¶ 5. *See also CDC Fact Sheet*, at 3; ECF No. 132-8 at 30 (2016 HCV GUIDELINES). But in 2014, AASLD and IDSA added an introductory statement to "reiterate that treatment will benefit almost all patients in all stages of chronic infection." *See* "Updated Introductory Statement of When and In Whom to Initiate Therapy," AASLD & IDSA, Oct. 23, 2014, attached hereto as Plaintiffs' **Exhibit 9**. And by July 6, 2016, IDSA and AASLD eliminated the prioritization tables altogether in recognition of the fact that continuing medical research had demonstrated the safety, tolerability, and dramatic benefits of treating *all* persons with chronic HCV infections with DAAs. Ex. 5, Dr. Thedinger

Decl., ¶¶ 6–8, 24; *see also* Ex. 8, Olson Decl., ¶ 10; ECF No. 132-8 at 30 (2016 HCV GUIDELINES); Ex. 4, Dr. Moseley Decl., ¶ 4.

Under the current prevailing medical standard of care, treatment with DAAs should be provided to every person with a chronic HCV infection, except those patients with a very limited life expectancy (less than 12 months) that cannot be remediated by treatment of HCV or liver transplantation. Ex. 5, Dr. Thedinger Decl., ¶ 7; Ex. 4, Dr. Moseley Decl., ¶ 4; Ex. 8, Dr. Olson Decl., ¶¶ 6–9; ECF No. 132-8 at 30, 39 (2016 HCV GUIDELINES). According to the CDC, "treating all [HCV]-infected persons using [DAA] therapies is cost-effective from a societal perspective." Ex. 3, *CDC Fact Sheet*, at 3; *see also* Ex. 7, Beckman 2016, at 1894.

DAAs have proven to be effective and safe. *See* Ex. 4, Dr. Moseley Decl. ¶ 5; Ex. 5, Dr. Thedinger Decl., ¶ 6; *see also* Ex. 6, HCV GUIDELINES, at 26–27. **In fact, the drugs have a near-perfect cure rate in certain patient populations.** *See* Ex. 4, Dr. Moseley Decl., ¶ 5; Ex. 6, HCV GUIDELINES, at 46. Unlike drugs previously used to treat chronic HCV infection, like interferon, DAAs have minimal side effects and the course of treatment is much shorter. Ex. 4, Dr. Moseley Decl., ¶ 5; Ex. 6, HCV GUIDELINES, at 213; Ex. 7, Beckman 2016, at 1893–94; *see also* ECF No. 30 ¶¶ 53–54 (Second Am. Compl.). As a result, DAAs have been hailed as "a dramatic advance in the treatment of HCV and in the entire field of medicine." Ex. 4, Dr. Moseley Decl., ¶ 5.

There are benefits to curing all patients with chronic hepatitis C infection, even those who have no detectable liver fibrosis. Ex. 5, Dr. Thedinger Decl., ¶ 8; Ex. 4, Dr. Moseley Decl., ¶ 4; Ex. 8, Dr. Olson Decl., ¶ 9; Ex. 6, HCV GUIDELINES, 26–27. For example, the risk of liver cancer, liver-failure-related mortality, and the need for liver transplantation are dramatically reduced (by 70% to 90%) in patients whose HCV is cured compared to those who are not cured.

Ex. 5, Dr. Thedinger Decl., ¶ 8; Ex. 6, HCV GUIDELINES, at 26–27. Studies also show marked improvements in other life-threatening or painful conditions associated with HCV progression, including serious and potentially lethal circulatory conditions, kidney disease potentially resulting in kidney failure, enlargement of the spleen, lymphocyte disorders, and diabetes. Ex. 5, Dr. Thedinger Decl., ¶ 21; Ex. 6, HCV GUIDELINES, at 26–27. In addition, medical studies indicate that patients cured of HCV consistently report improvements in rates of pain, fatigue, and other markers of health. Ex. 5, Dr. Thedinger Decl., ¶ 9; Ex. 6, HCV GUIDELINES, at 26–30; *see also* Ex. 4, Dr. Moseley Decl., ¶ 4 (noting that achieving a sustained virologic response "has been shown to prolong survival and decrease complications and liver-related deaths in patients with all stages of fibrosis").

There is currently no medical evidence that supports delaying treatment for patients with chronic HCV infections because they have only early-stage fibrosis. Ex. 5, Dr. Thedinger Decl., ¶¶ 10–11; Ex. 4, Dr. Moseley Decl., ¶¶ 4, 7; Ex. 8, Dr. Olson Decl., ¶¶ 8, 10; Ex. 6, HCV GUIDELINES, at 26–27; ECF No. 132-8 at 32 (2016 GUIDELINES) ("Treatment delay may decrease the benefit of SVR [virologic cure]."). *Cf.* Ex. 2, Dr. Bredeman Aff., ¶¶ 13–14. To the contrary, though treatment with DAA drugs is expected to benefit nearly all chronically infected persons at any stage of the disease, the earlier an infected individual is treated with DAAs, the greater the benefits. Ex. 6, HCV GUIDELINES, at 26 ("Because of the many benefits associated with successful HCV treatment, clinicians should treat HCV-infected patients with antiviral therapy with the goal of achieving SVR [virologic cure], preferably early in the course of chronic HCV infection before the development of severe liver disease and other complications. . . . Initiating therapy in patients with lower-stage fibrosis augments the benefits of SVR."); *accord* Ex. 5, Dr.

Thedinger Decl., ¶¶ 6–8; Ex. 4, Dr. Moseley Decl., ¶ 7; ECF No. 132-8 at 30–31 (2016

GUIDELINES). As Dr. Moseley states in his declaration:

> The AASLD pointed out that "[d]elaying treatment for patients until they develop advanced liver disease leads to higher costs and higher demand for liver transplants," puts patients at risk for various mental-health conditions, and can lead patients to develop other medical problems like HCV-associated heart disease, lymphatic and liver cancers, kidney damage, and immune related diseases.

Ex. 4 ¶ 7.

Both clinical trials and modeling studies demonstrate that the benefits of treatment—

including overall mortality rates—are augmented when treatment is offered before liver fibrosis

progresses. Ex. 6, HCV GUIDELINES, at 26–27; Ex. 5, Dr. Thedinger Decl, ¶¶ 8–10; *see also* Ex.

8, Dr. Olson Decl., ¶ 10. *Cf.* Ex. 2, Dr. Bredeman Aff., ¶¶ 13–14. Moreover, severe, life-

threatening complications such as renal failure can occur at any time in a person with hepatitis C,

even immediately after a person is infected. Ex. 5, Dr. Thedinger Decl., ¶¶ 21–22; *see also* Ex. 2,

Dr. Bredeman Aff. ¶¶ 15–17; Ex. 3, *CDC Fact Sheet*, at 1; Ex. 6, HCV GUIDELINES, at 33

("[T]reatment of HCV infection may improve or prevent extraheptatic complications, including

diabetes mellitus, cardiovascular disease, renal disease, and B-cell non-Hodgkin lymphoma,

which are not tied to fibrosis stage.") (internal citations omitted).

Thus, denying treatment to a patient with chronic HCV because of a low APRI score[3] (or

any other measurement of liver fibrosis) is far out of line with the medical standard of care and

has been for years. Ex. 5, Dr. Thedinger Decl., ¶¶ 11, 13; Ex. 4, Dr. Moseley Decl., ¶¶ 8, 9; Ex.

8, Dr. Olson Decl., ¶¶ 10–11; ECF 132-8 at 30–32 (2016 HCV GUIDELINES); Ex. 6, HCV

GUIDELINES, at 33 ("[S]trong and accumulating evidence argue against deferral because of

---

[3] APRI is a ratio between the amount of the enzyme AST and the amount of platelets in a person's blood. *See* Ex. 4, Moseley Decl., ¶ 8. Performance testing of the score subsequently has demonstrated that APRI can identify HCV-related fibrosis with only "a moderate degree of accuracy." *Id.*

decreased all-cause morbidity and mortality, prevention of onward transmission, and quality-of-life improvements for patients treated regardless of baseline fibrosis."). It is also no longer appropriate to withhold treatment for reasons that might have justified deferring treatment with the older, less-effective medications that carried the risk of serious side effects. *See* Ex. 5, Dr. Thedinger Decl., ¶¶ 12–14 & 18–20; Ex. 4, Dr. Moseley Decl., ¶¶ 5–9 & 13; Ex. 8, Dr. Olson Decl., ¶¶ 10–11; Ex. 6, HCV GUIDELINES, at 32 (comparing DAAs favorably to "the toxic effects and long treatment duration of older interferon-based therapies"), 33 ("Deferral practices based on fibrosis stage alone are inadequate and shortsighted."); Ex. 7, Beckman 2016, at 1894 (as compared to interferon, DAAs "have a cure rate of more than 90 percent, have almost no side effects, are oral regimens instead of injections, and shorten treat duration to two to six months").

### C. Defendants' HCV policies and practices wholly fail to comply with the prevailing standard of care.

MDOC and Corizon have entered into a contract establishing that Corizon will provide all medical services to persons incarcerated in MDOC facilities with payment from the State. *See* Defendants' Contract and Amendments, attached hereto as Plaintiffs' **Exhibit 19**. Defendants maintain the following policies and customs that are not medically justifiable and deviate dramatically from the prevailing standard of care:

(1) providing DAA drug treatment to a tiny fraction of inmates with chronic HCV, *see, e.g.*, Ex. 1, MDOC Resps. to Pls.' Second Set of Interrogs.; Ex. 2, Dr. Bredeman Aff., ¶¶ 9, 14; MDOC Hepatitis Chart, ECF No. 132-3 and attached hereto as Plaintiffs' **Exhibit 10**, at 8 (MDOC treatment chart showing fewer than 10 inmates treated with DAA drugs in 2016). *Compare* Ex. 5, Dr. Thedinger Decl., ¶¶ 3–11; Ex. 4, Dr. Moseley Decl., ¶¶ 7–9, 13; Ex. 8, Dr. Olson Decl., ¶¶ 10–11.

(2) relying exclusively on APRI score to determine the stage of a person's fibrosis or cirrhosis, *see, e.g.*, Ex. 2, Dr. Bredeman Aff., ¶¶ 19–20; Informal Resolution Request Responses, ECF No. 132-6 and attached hereto as Plaintiffs' **Exhibit 11**, at 1–2, 5–8; Declaration of Donnie Fuller ("Fuller Decl."), attached hereto as Plaintiffs' **Exhibit 12**, ¶ 25. *Compare* Ex. 5, Dr. Thedinger Decl., ¶ 11; Ex. 4, Dr. Moseley Decl., ¶ 8; Ex. 8, Dr. Olson Decl., ¶ 10; Ex. 6, HCV GUIDELINES, at 33 (stating that APRI is not "sensitive enough to rule out substantial fibrosis").

(3) using an APRI score to determine whether a person should be treated with DAA medications, *see, e.g.*, Ex. 12; Fuller Decl., ¶ 25; Ex. 11, IRR Responses, 1–2, 5–8; Ex. 2, Dr. Bredeman Aff. ¶¶ 19–20; Corizon HCV Protocols, ECF No. 114-2 and attached hereto as Plaintiffs' **Exhibit 13**. *Compare* Ex. 5, Dr. Thedinger Decl., ¶ 11; Ex. 4, Dr. Moseley Decl., ¶ 8; Ex. 8, Dr. Olson Decl., ¶¶ 10–11; Ex. 6, HCV GUIDELINES, at 33.

(4) failing to provide treatment to HCV-positive inmates unless they have an APRI score above 2.0 that persists for several months, even though more than half of persons with cirrhosis will not have an APRI score at or above 2.0, and Defendants know that levels of AST—one of the variables in the formula used to determine APRI score— fluctuate, *see, e.g.*, Declaration of John Ritchie, attached hereto as Plaintiffs' **Exhibit 14**, ¶¶ 4, 8, 12, and attachment; Ex. 2, Dr. Bredeman Aff., ¶ 27; Ex. 13, Corizon HCV Protocols, at 1–2; Ex. 11. *Compare* Ex. 5, Dr. Thedinger Decl., ¶ 11; Ex. 4, Dr. Moseley Decl., ¶ 8; Ex. 8, Dr. Olson Decl., ¶¶ 10–11; Ex. 6, HCV GUIDELINES, at 33 ("at best, [blood tests] are only moderately useful for identifying clinically significant fibrosis or cirrhosis").

(5) disregarding independent diagnoses of cirrhosis or significant hepatitis fibrosis in making treatment decisions, *see, e.g.*, Ex. 12, Fuller Decl., ¶¶ 23–24, 30–31; Ex. 14, Ritchie Decl., ¶¶ 8, 12. *Compare* Ex. 6, HCV GUIDELINES, at 33 ("Individuals with clinically evident cirrhosis do not require additional staging.").

(6) basing treatment decisions on cost, to the exclusion of medically appropriate judgment about the need for treatment, *see, e.g.*, Ex. 2, Dr. Bredeman Aff., ¶¶ 9–10, 13–14 (describing whom MDOC treats); MDOC Emails at MDOC 09237 ("[The Hep C drug] is causing some major budget concerns in some departments.") and 20711 ("We are 100% privatized, but if we require the vendor to provide [HCV treatment] for over 4500 Hep C positive offender, our rate will increase exponentially."), together attached hereto as Plaintiffs' **Exhibit 15**; Ex. 12, Fuller Decl., ¶ 26. *Compare* Ex. 4, Dr. Moseley Decl., ¶¶ 3–4; Ex. 8, Dr. Olson Decl., ¶¶ 10–11.

(7) failing to accurately test for and diagnose chronic HCV because of a lack of systematic opt-out antibody testing and because of a systematic failure to conduct RNA testing on people with HCV antibodies, *compare* Plaintiff Jamerson 2015 medical record (reflecting February 26, 2015 positive HCV antibody test), *with* Plaintiff Jamerson 2017 medical record (indicating viral load not tested until June 2017), together attached hereto as Plaintiffs' **Exhibit 16**; Ex. 13, Corizon HCV Protocols. *Compare* Ex. 4, Dr. Moseley Decl., ¶ 3; Ex. 5, Dr. Thedinger Decl., ¶ 17; Ex. 6, HCV GUIDELINES, at 16.

(8) failing to adequately educate patients about HCV, *see* Ex. 12, Fuller Decl., ¶¶ 7–8; Ex. 14, Ritchie Decl., ¶¶ 6–7, 12; Ex. 10, MDOC Hepatitis Chart, at 8 (showing that

a fraction of patients in Hepatitis C Chronic Care clinic received Hepatitis C
counseling in 2016). *Compare* Ex. 6, HCV GUIDELINES, at 19, 23.

(9) deliberately creating barriers to inmates' ability to understand what blood draws are
for and what criteria are used to determine what treatment will be provided, review
their medical records, and see their providers' determinations about medically
appropriate treatment, *see* Ex. 12, Fuller Decl., ¶¶ 7–8, 22; Ex. 14, Ritchie Decl.,
¶¶ 6–7, 12, Attachment A at 14 (from August 1, 2018 record of Capital Region
Medical Center treating class member's liver cancer: "Complete and return in
SEALED envelope with Correctional Officer . . . . For security reasons, inmates must
NOT be informed of recommended treatment or possible hospitalization."); MDOC
Medical Accountability Records System printout, attached hereto as Plaintiffs'
**Exhibit 21** ("The following documents [medical records] are for IRR and grievance
documentation only and should not be shared with the offender").

Due to these deliberate, ongoing policies and customs, Defendants deprive more than
95% of inmates at MDOC with chronic HCV of constitutionally adequate medical care,
including by failing to provide DAA treatment when that decision is contrary to reasonable
medical judgment.

### D. Defendants are knowingly denying life-saving treatment to thousands of inmates with chronic HCV.

Approximately 15% of the population under the supervision, care, and custody of the
MDOC has been diagnosed with chronic HCV. *See, e.g.*, Ex. 10, MDOC Hepatitis Chart, at 8;
Ex. 7, Beckman 2016, at 1893, Exhibit S5 (chart); ECF No. 132-4 at 19, 25, 97, 105, 146–47,
166 (January 2014 Annual Report of the Joint Committee on Corrections) (reports from
individual MDOC facilities). This Court previously noted that "[e]ven with a conservative

estimate, there are likely at least 2,000 members of the class: those MDOC inmates with chronic HCV who have not received DAA drug treatment." ECF No. 174 at 12.

Indeed, the MDOC admits that, as of February 26, 2019, when it responded to Plaintiffs' interrogatories, there were 4,406 individuals in MDOC custody who were not only not being treated now for their chronic HCV but who will never be treated unless Defendants decide to reclassify them. Ex. 1, MDOC Resps. to Pls.' Second Set of Interrogs.; Ex. 2, Dr. Bredeman Aff., ¶ 20. These numbers have been abysmally low for years. *Compare* Ex. 7, Beckman 2016, at Ex. S5 (as of January 2015, just 5 out of 4,736 inmates in MDOC custody with known HCV infections were receiving treatment, or approximately 0.11%); Ex. 10, MDOC Hepatitis Chart, at 8 (in 2016, fewer than 10 inmates were treated with DAA drugs, compared to a population in Hepatitis C Chronic Care of approximately 5,000).

## III. LEGAL STANDARD

In deciding whether to issue a preliminary injunction, the Court considers the so-called "*Dataphase* factors": (1) the likelihood that Plaintiffs will prevail on the merits; (2) whether Plaintiffs face a threat of irreparable harm absent the injunction; (3) the balance between the harm Plaintiffs face and the injury that the injunction's issuance would inflict upon Defendants; and (4) the public interest. *See Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981) (en banc); *accord Amos v. Higgins*, 996 F. Supp. 2d 810, 812 (W.D. Mo. 2014).

At this stage, Plaintiffs need not prove their case in chief; to the contrary, they need demonstrate only a "fair chance" that they will prevail on the merits of their claim. *Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 732 (8th Cir. 2008) (en banc) ("[W]e emphasize that district courts should still apply the familiar 'fair chance of prevailing' test where a preliminary injunction is sought to enjoin something other than government action based on

presumptively reasoned democratic processes.");[4] *see also PCTV Gold, Inc. v. SpeedNet, LLC*, 508 F.3d 1137, 1143 (8th Cir. 2007) ("While an injunction cannot issue if there is no chance on the merits, the Eighth Circuit has rejected a requirement as to a party seeking preliminary relief prove a greater than fifty per cent likelihood that he will prevail on the merits." (internal quotation marks and citations omitted)).

In ruling on a motion for a preliminary injunction, a court may consider "evidence that is less complete than in a trial on the merits." *Church Mut. Ins. Co. v. Sands*, No. 4:14-cv-03119, 2014 WL 3907831, at *2 (W.D. Mo. Aug. 11, 2014) (quoting *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)). As a result, "the court may properly consider evidence that would ordinarily be inadmissible, such as hearsay, in support of granting a motion for a preliminary injunction." *H&R Block Tax Servs. LLC v. Clayton*, No. 4:16-cv-00185, 2016 WL 1247205, at *1 (W.D. Mo. Mar. 24, 2016).[5]

## IV. ARGUMENT

### A. Plaintiffs are likely to succeed on the merits.

The Eighth Amendment requires prison officials to provide inmates with adequate medical care. *Estelle v. Gamble*, 429 U.S. 97, 103 (1976); *see also Crooks v. Nix*, 872 F.2d 800, 804 (8th Cir. 1989) ("Where a prisoner needs medical treatment prison officials are under a constitutional duty to see that it is furnished."). To prevail on a claim of constitutionally

---

[4] There is no question here that Defendants' policies—created and implemented by an agency and its private health care contractor—were adopted outside of the deliberative context of the democratic process. Therefore, Plaintiffs need only demonstrate a "fair chance" of success. However, this factor would weigh in Plaintiffs' favor even under a more stringent likelihood-of-success standard.

[5] Pursuant to Federal Rule of Evidence 201(b), the Court may also take "judicial notice on its own at any stage of the proceeding of facts not subject to reasonable dispute in they can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned, such as publications of official government agencies." *Estate of Snyder v. Julian*, No. 1:11-cv-00024, 2013 WL 4042195, at *13 (E.D. Mo. Aug. 8, 2013). For example, the Court may take judicial notice of publications by the Centers for Disease Control and Prevention (CDC) relating to HCV. *Id*. (citing *Gent v. Cuna Mut. Ins. Soc'y*, 611 F.3d 79, 84 n.5 (1st Cir. 2010) (taking judicial notice of information about Lyme disease taken from CDC website)).

inadequate medical care, a plaintiff must show the defendants acted with deliberate indifference to the prisoner's serious medical needs. *Estelle*, 429 U.S. at 104; *see Vaughn v. Greene Cty.,* 438 F.3d 845, 850 (8th Cir. 2006) ("[T]he Eighth Amendment prohibition on cruel and unusual punishment extends to protect prisoners from deliberate indifference to serious medical needs."); *see also Nelson v. Corr. Med. Servs.*, 583 F.3d 522, 528 (8th Cir. 2009) (en banc) (holding that "[a] prison official is deliberately indifferent if she "knows of and disregards" a serious medical need or a substantial risk to an inmate's health or safety" (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994))).

To prevail on an Eighth Amendment claim of "deprivation of medical care" in the Eighth Circuit, an inmate must show (1) a "sufficiently serious" deprivation, (2) that the defendant "was deliberately indifferent to the inmate's serious medical needs," and (3) that such deliberate indifference caused injury to the inmate. *Coleman v. Rahija*, 114 F.3d 778, 784 (8th Cir. 1997); *see Gibson v. Weber*, 433 F.3d 642, 646 (8th Cir. 2006). "Deliberate indifference" has both an objective component—plaintiffs' objectively serious medical need—and a subjective component—defendants actually knew of, but disregarded, the serious medical need. *See Meuir v. Greene Cty. Jail Emps.*, 487 F.3d 1115 (8th Cir. 2007); *Grayson v. Ross*, 454 F.3d 802, 808–09 (8th Cir. 2006); *Coleman*, 114 F.3d at 784. "When an inmate alleges that a delay in medical treatment constituted a constitutional deprivation, the objective seriousness of the deprivation should also be measured by reference to the effect of delay in treatment." *Coleman*, 114 F.3d at 784 (internal quotation marks omitted).

Plaintiffs have much better than a "fair chance" of establishing each of these elements. *See Rounds*, 530 F.3d at 732. Specifically: (1) Plaintiffs' chronic hepatitis C constitutes a serious medical need requiring medically justifiable policies of testing, diagnosis, staging, and treatment

with DAAs; (2) Defendants knew of, but deliberately disregarded (and continue to disregard), Plaintiffs' serious medical needs; and (3) Defendants' deliberate disregard for Plaintiffs' serious medical needs caused and continues to cause Plaintiffs' injury and expose them to substantial, serious health risks.

1. Plaintiffs' chronic HCV is a serious medical need.

A "serious medical need" is "one that has been diagnosed by a physician as requiring treatment, or one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Schaub v. VonWald*, 638 F.3d 905, 914 (8th Cir. 2011); *see also Coleman*, 114 F.3d at 784.

Chronic hepatitis C infection is undoubtedly a serious medical need. Plaintiffs who are suffering from chronic HCV infections face "substantial risks of serious harm, including, but not limited to, bleeding from any site in the body, accumulation of fluid in the legs or abdomen, life-threatening infections, significant pain or discomfort, organ failure, liver cancer, and death." *Hoffer*, 290 F. Supp. 3d at 1299; *see also* Ex. 5, Dr. Thedinger Decl., ¶ 22; Ex. 14, Ritchie Decl., ¶¶ 4, 11; Ex. 12, Fuller Decl., ¶¶ 9–12. Fortunately, DAAs have over a 90% "cure rate." Ex. 4, Dr. Moseley Decl., ¶ 5; Ex. 7, Beckman 2016, at 1894. As discussed above, the medical standard of care mandates treatment with DAA drugs for nearly all people with chronic HCV infections. Ex. 5, Dr. Thedinger Decl., ¶¶ 6–9. There is currently no medical evidence that supports delaying treatment for patients with chronic HCV infections, and delay puts patients at substantial risk of harm, including various mental-health conditions and other medical problems like HCV-associated heart disease, lymphatic and liver cancers, kidney damage, and immune-related diseases. *Id.* ¶ 10; Ex. 8, Dr. Olson Decl., ¶ 10; Ex. 4, Dr. Moseley Decl., ¶ 7.

Accordingly, federal courts routinely find that chronic HCV infection constitutes a serious medical need. *See*, *e.g.*, *Hoffer*, 290 F. Supp. 3d at 1299 ("Nor should it be surprising that

this Court finds chronic HCV to be a serious medical need." (citations omitted)); *Abu-Jamal*,

2017 WL 34700, at *14 ("the Court finds that Plaintiff has a reasonable likelihood of showing

that chronic hepatitis C constitutes a serious medical need under the Eighth Amendment");

*Hilton v. Wright*, 928 F. Supp. 2d 530, 547 (N.D.N.Y. 2013) ("It is well established that HCV is

a serious medical condition." (citations omitted)).[6] The same should be held here.

> 2.  Defendants knew of, but deliberately disregarded (and continue to disregard),
>     Plaintiffs' serious medical need.

For purposes of an Eighth Amendment claim, the Eighth Circuit has emphasized that "[a]

prison official need not believe that serious harm will actually befall an inmate or have actual

knowledge that the inmate is experiencing serious harm: 'it is sufficient that the official knows of

a substantial risk that the inmate will suffer serious harm.'" *Schaub*, 638 F.3d at 920 (quoting

*Kahle v. Leonard*, 477 F.3d 544, 551 (8th Cir. 2007)); *see also Coleman*, 114 F.3d at 786 ("The

factual determination that a prison official had the requisite knowledge of a substantial risk may

be inferred from circumstantial evidence or from the very fact that the risk was obvious.").

Although medical negligence in and of itself does not violate the Eighth Amendment,

"medical treatment may so deviate from the applicable standard of care as to evidence a

physician's deliberate indifference." *Moore v. Duffy*, 255 F.3d 543, 545 (8th Cir. 2001); *see also*

*McRaven v. Sanders*, 577 F.3d 974, 983 (8th Cir. 2009). For example, a doctor's decision to take

an easier and less efficacious course of treatment can constitute deliberate indifference. *Smith v.*

*Jenkins*, 919 F.2d 90, 93 (8th Cir. 1990); *see also Prosser v. Nagaldinne*, No. 4:09-cv-2117,

2011 WL 5975902 (E.D. Mo. Nov. 30, 2011), at *1 (holding that total deprivation of care is not

necessary to find a constitutional violation; rather, "grossly incompetent or inadequate care can

---

[6] In fact, in its ruling on MDOC's motion to dismiss, this Court held that Plaintiffs sufficiently alleged "a serious medical need for prompt treatment with DAAs." ECF No. 155 at 11.

also constitute deliberate indifference, as can a doctor's decision to take an easier and less efficacious course of treatment") (citing *Langford v. Norris*, 614 F.3d 445, 460 (8th Cir. 2010)).

Defendants know, and have known, that there is a "substantial risk" that inmates who do not receive DAA medications to treat chronic HCV infections will suffer serious harm. As described in the statement of facts, the risks of untreated chronic HCV infections are well-documented, profound, and life threatening. *See* Ex. 5, Dr. Thedinger Decl., ¶¶ 8–11; *see also Stafford*, 2018 WL 4361639, at *20 ("Individuals suffering from chronic HCV face a variety of immediate symptoms, as well as the certainty that their disease will progress through the stages of infection."). Indeed, Corizon's own associate regional medical director, Dr. Thomas Bredeman, avers that Corizon knows of and "considers the recommendations" of the AASLD in "assessing, evaluating and treating patients with HCV," *see* Ex. 2, ¶ 10, and AASLD's guidelines have warned for years that the failure to provide effective treatment to individuals with chronic HCV exposes them to serious harm.[7]

DAA drugs have a near-perfect cure rate and carry minimal side effects, yet Defendants continue to deliberately disregard this known and obvious risk. Defendant MDOC's more recent interrogatory responses indicate that as of February 2019 there were 4590 inmates diagnosed with chronic HCV, and of those, 4406 were not being treated and will not be treated unless Defendants reclassify them. Ex. 1, MDOC Resps. to Pls.' Second Set of Interrogs.; *see also* Ex. 2, Dr. Bredeman Aff., ¶ 14. Put another way, Defendants still are denying life-saving treatment to more than 95% of class members, years after this case was filed.

---

[7] *See, e.g.*, Ex. 6 at 33 ("As noted, strong and accumulating evidence argue against deferral because of decreased all-cause morbidity and mortality, prevention of onward transmission, and quality-of-life improvements for patients treated regardless of baseline fibrosis. Additionally, treatment of HCV infection may improve or prevent extrahepatic complications, including diabetes mellitus, cardiovascular disease, renal disease, and B-cell non-Hodgkin lymphoma, . . . which are not tied to fibrosis stage . . . ... Deferral practices based on fibrosis stage alone are inadequate and shortsighted.").

Defendants continue to cling to "such systemic and gross deficiencies in . . . procedures that the inmate population is effectively denied access to adequate medical care," and this amounts to deliberate indifference to Plaintiffs' serious medical needs. ECF No. 174 at 7; *see also Stafford*, 2018 WL 4361639, at *20 ("98.8% of individuals suffering from chronic HCV have received no treatment at all. This can be described in no other way than an effective denial of treatment for those suffering from chronic HCV.").

3. <u>Defendants' deliberate disregard caused (and continues to cause) Plaintiffs to suffer injury.</u>

Defendants' conduct has caused Plaintiffs constitutional harm. For example, after requesting treatment but before receiving treatment, Plaintiff Michael Postawko was diagnosed with cirrhosis. *See, e.g.*, Postawko Medical Records, Corizon 0098–99, attached hereto as Plaintiffs' **Exhibit 17**. Class member John Ritchie, who has been trying to obtain treatment for years, *see* Ex. 14, was diagnosed with liver cancer last year and still has not received treatment for his chronic HCV. Ex. 14, Ritchie Decl., ¶¶ 11–12. Class member Fuller was told he is "on the verge of cirrhosis" and also has been trying (unsuccessfully) to get treatment for years. Ex. 12, Fuller Decl., ¶¶ 23, 30–33. He lives in fear of dying from his chronic HCV infection if not treated. *Id.*

These preventable injuries are typical of the class at large, and they could be avoided if Plaintiffs were provided treatment with DAA drugs. Yet medically necessary treatment is denied to them because of Defendants' unconstitutional policies and practices. *See Hoffer*, 290 F. Supp. 3d at 1303 ("because Plaintiffs' claim is based on inadequacies in FDC's policies and implementation of those policies, the causation element has been satisfied").

4. <u>Recent Decisions Establish Plaintiffs' Likelihood of Success.</u>

Plaintiffs' likelihood of success on the merits is supported not just by the evidence adduced thus far, but also by recent legal developments in similar cases across the country. In three recent decisions—*Stafford*, *Hoffer*, and *Abu-Jamal*—federal courts have evaluated conduct like that at issue here and found it likely unconstitutional under the Eighth Amendment. The same outcome is warranted here.

(i) *Stafford v. Carter (Indiana)*

In *Stafford*, inmates with untreated, chronic hepatitis C brought a class action against the Indiana Department of Corrections (IDOC), alleging violations of the Eighth Amendment and other rights. After granting the plaintiffs' motion for class certification, the court granted plaintiffs' motion for summary judgment as to liability with respect to their Eighth Amendment claim. 2018 WL 4361639, at *1. In addressing the merits of plaintiffs' Eighth Amendment claim, the court held that chronic HCV infection is a serious medical need. *Id*. at *12. Furthermore, the court held that plaintiffs had established the IDOC's deliberate indifference because the defendants were "aware of the substantial risk of both present and future harm to HCV-infected inmates, and Defendants have disregarded the risk by electing not to treat 98.8% of infected inmates." *Id*. at *19.

As discussed above, because their policies create a barrier to medically appropriate treatment, Defendants in this case treat just a fraction of a percentage more of the chronic-HCV-positive population than did the defendants in *Stafford*—and, in raw numbers, fewer total inmates. *Id.* at *12 (IDOC had treated 41 people as of September 2018); *compare* Ex. 1, MDOC Resps. to Pls.' Second Set of Interrogs. (Defendants treating 15 people as of February 2019).

(ii)  *Hoffer v. Jones (Florida)*

In *Hoffer*, inmates with untreated chronic HCV infections brought a class action against the Florida Department of Corrections (FDC), alleging violations of the Eighth Amendment and other rights. After granting the plaintiffs' motion for class certification, the court proceeded to also grant their motion for preliminary injunction. 290 F. Supp. 3d at 1305.

Addressing the merits of the Eighth Amendment claim, the court held that chronic HCV infection is a serious medical need. 290 F. Supp. 3d at 1299. The court found that FDC's failure to properly treat inmates with HCV was due to a lack of funding. *Id.* at 1300. But because "funding is no excuse for FDC's failure to provide treatment," the court nonetheless held that FDC "has been deliberately indifferent [to] the serious medical needs of Plaintiffs and the class." *Id.* at 1301. Moreover, the court held that FDC's "attempt to moot" the case by adopting new procedures was insufficient, stating: "This Court has no doubt that without a court-ordered injunction, FDC is unlikely to treat inmates in a constitutionally appropriate manner." *Id.* at 1302-03.[8]

(iii)  *Abu-Jamal v. Wetzel (Pennsylvania)*

In *Abu-Jamal*, the court held that plaintiff, an inmate, had a reasonable likelihood of showing that the Pennsylvania Department of Correction (PDOC) acted with deliberate indifference to his chronic hepatitis C when denying him treatment based on its "prioritization protocol" because the PDOC "deliberately chose a course of monitoring over treatment for non-medical reasons[,] . . . allowing Plaintiff's condition to worsen." 2017 WL 34700, at *14–*16.

---

[8]  After granting the plaintiffs' motion for a preliminary injunction, the court issued a separate opinion which delineated the actions the FDC would have to undertake to properly treat inmates with chronic hepatitis C. *See Hoffer v. Jones*, No. 4:17-cv-00214, ECF No. 185 (N.D. Fla. Dec. 13, 2017). For the Court's convenience, a copy of this order is attached hereto as Plaintiffs' **Exhibit 18**.

The court explained that requiring patients to develop significant fibrosis or cirrhosis was, like an absolute refusal of treatment, "deliberate indifference on the part of prison officials." *Id.*

### B. Plaintiffs face substantial threat of serious, irreparable harm.

Absent an injunction, Plaintiffs will continue to be subjected to Defendants' unconstitutional policies, which expose Plaintiffs to substantial health risks. "A threat to a constitutional right is generally presumed to constitute irreparable harm." *M.B. v. Corsi*, No. 2:17-cv-4102, 2018 WL 5504178, at *5 (W.D. Mo. Oct. 29, 2018) (collecting cases). "Danger to health also generally warrants a presumption of irreparable harm." *Id.* (same). Here, Plaintiffs have provided considerable evidence of the substantial harm Plaintiffs are exposed to so long as Defendants continue to systematically deny them treatment for their chronic HCV infections in contravention of the prevailing standard of care. *See, e.g.*, Ex. 5, Dr. Thedinger Decl., ¶¶ 21–22; Ex. 4, Dr. Moseley Decl., ¶ 3; Ex. 8, Dr. Olson Decl., ¶ 9; Ex. 6, HCV GUIDELINES, at 26–30.

### C. The balance of harms militates in favor of a preliminary injunction.

The balance of harms weighs in favor of Plaintiffs. If the Court grants a preliminary injunction requiring implementation of medically appropriate policies regarding chronic HCV, including treatment with DAA drugs, Defendants will have to pay for that care. However, "[t]he threat of harm to the plaintiffs cannot be outweighed by the risk of financial burden or administrative inconvenience to the defendants." *Hoffer*, 290 F. Supp. 3d at 1304 (citing *Laube v. Haley*, 234 F. Supp. 2d 1227, 1252 (M.D. Ala. 2002)); *see also Abu-Jamal*, 2017 WL 34700, at *20 ("While the Court is sensitive to the realities of budgetary constraints and the difficult decisions prison officials must make, the economics of providing this medication cannot outweigh the Eighth Amendment's constitutional guarantee of adequate medical care."). In this case, that threat is significant: absent an injunction, Plaintiffs will continue to suffer considerable

harm due to Defendants' failure to treat properly Plaintiffs' chronic HCV infections—including, possibly, death. *See Kai v. Ross*, 336 F.3d 650, 656 (8th Cir. 2003) (finding, in case seeking to compel Nebraska agency to continue plaintiffs' Medicaid benefits, that "the danger to plaintiffs' health, and perhaps even their lives, gives them a strong argument of irreparable injury"). Thus, the threatened harm to Plaintiffs substantially outweighs any harm that an injunction would cause Defendants. Indeed, it may be difficult to predict perfectly *which* Plaintiffs will experience the most debilitating symptoms, progress to cirrhosis, develop liver cancer, and suffer from significant extrahepatic complications of HCV. *See* Ex. 4, Dr. Moseley Decl., ¶ 4. But given that there are more than 4,000 class members, it is a near-certainty that *many* Plaintiffs will experience these serious harms without treatment.

### D.  The public interest supports granting an injunction.

The public has a strong interest in ensuring that Plaintiffs' constitutional rights are protected. *See*, *e.g.*, *Hoffer*, 290 F. Supp. 3d at 1304 (citing *Laube*, 234 F. Supp. 2d at 1252 ("[T]here is a strong public interest in requiring that the plaintiffs' constitutional rights no longer be violated ….")). The public has an interest in seeing that inmates with chronic HCV infections are provided medical care that meets the standard required by the Eighth Amendment. Moreover, a constitutionally adequate HCV treatment policy, which would result in cure for many inmates, would also indirectly benefit the public health by reducing the risk of spreading disease to other people in and out of prison.

An injunction would also serve the public's interest in the rehabilitative role of the criminal justice system. *See, e.g.*, *Hoffer*, 290 F. Supp. 3d at 1304–05 (citing *Costello v. Wainwright*, 397 F. Supp. 20, 37 (M.D. Fla. 1975) ("[I]t seems clear to this Court that, in the long run, providing decent medical care and housing to inmates would serve to promote the

rehabilitative goals of the criminal justice system so as to permit their re-entry into free society as upright and law abiding citizens and to prevent their re-entry into the criminal justice system."), *vacated in part on other grounds*, 539 F.2d 547 (5th Cir. 1976), *rev'd*, 430 U.S. 325 (1977)).

## V. CONCLUSION

For the foregoing reasons, Plaintiffs respectfully ask that the Court grant their motion for a preliminary injunction requiring Defendants to implement a policy that comports with the prevailing medical standard of care for inmates with chronic HCV infection and grant such other relief which the Court deems just and appropriate under the circumstances.

Respectfully submitted,

/s/ Anthony E. Rothert
Anthony E. Rothert, #44827
Jessie Steffan, #64861
Omri E. Praiss, #41850
American Civil Liberties Union
of Missouri Foundation
906 Olive Street, Suite 1130
St. Louis, Missouri 63108
Phone: (314) 652-3114
Fax: (314) 652-3112
trothert@aclu-mo.org
jsteffan@aclu-mo.org

Gillian R. Wilcox, #61278
American Civil Liberties Union
of Missouri Foundation
406 West 34th Street, Suite 420
Kansas City, Missouri 64111
Phone: (816) 470-9938
Fax: (314) 652-3112
gwilcox@alcu-mo.org

Amy E. Breihan, #65499
Megan G. Crane, #71624
RODERICK & SOLANGE
MACARTHUR JUSTICE CENTER

3115 South Grand Blvd., Suite 300
St. Louis, MO 63118
Phone: (314) 254-8540
Fax: (314) 254-8547
amy.breihan@macarthurjustice.org
megan.crane@macarthurjustice.org

Elizabeth L. Henthorne (*pro hac vice*)
Amelia I. P. Frenkel (*pro hac vice*)
Anastasia M. Pastan (*pro hac vice*)
Wilkinson Walsh + Eskovitz, LLP
2001 M Street NW
10th Floor
Washington, DC 20036
Phone: (202) 847-4000
Fax: (202) 847-4005
bhenthorne@wilkinsonwalsh.com
afrenkel@wilkinsonwalsh.com
apastan@wilkinsonwalsh.com

Meghan C. Cleary (*pro hac vice*)
Wilkinson Walsh + Eskovitz, LLP
11601 Wilshire Blvd., Suite 600
Los Angeles, CA 90025
Phone: (424) 291-9669
Fax: (202) 847-4005
mcleary@wilkinsonwalsh.com

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing was filed electronically and served by operation of the CM/ECF system on all counsel of record on June 17, 2019.

/s/ Anthony E. Rothert