IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

| | |
|---|---|
| MICHAEL POSTAWKO, *et al.*, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | No. 2:16-cv-4219-NKL |
| ) | |
| MISSOURI DEPARTMENT OF ) | |
| CORRECTIONS, *et al.*, ) | |
| ) | |
| Defendants. ) | |

**PLAINTIFFS' RESPONSE TO NOTICE OF SUPPLEMENTAL AUTHORITY**

Defendants' claim that *Atkins v. Parker*, 2019 WL 4748299 (M.D. Tenn. Sept. 30, 2019), is on all fours with this case is simply inaccurate. As set forth below, Defendants fail to acknowledge critical differences between the policies at issue in *Atkins* and here, and ignore the ways in which the *Atkins* decision undermines their positions and experts.

**A. Tennessee's Updated, Written Policies Are A Far Cry From Missouri's**

Although Plaintiffs would argue that Tennessee's HCV policies and practices are constitutionally deficient, the *Atkins* decision makes clear they are nevertheless significantly better than Missouri's ad hoc practices.

The Tennessee Department of Corrections ("TDOC") has an updated, written policy implemented in 2019, including compliance overseen by two state government doctors, which even the plaintiffs' expert recognized was a "significant" improvement over TDOC's prior policy. *Atkins* ¶ 51. Among other features, TDOC's policy includes:

- universal opt-out testing at intake, *id.* ¶ 52;
- timely diagnostic RNA testing, *id.* ¶¶ 22, 53;
- fibrosis staging and genotyping within two months of RNA testing, *id.* ¶ 53;

- the use of FibroScan for "every HCV inmate in TDOC custody," not just once, but every six months, *id.* ¶¶ 55, 68;

- education and monitoring for all HCV-positive inmates "at least every six months," *id.* ¶ 68[1];

- a decision-making body that includes an infectious disease specialist, *id.*[2];

- routine hepatocellular carcinoma monitoring for inmates at F3 or F4, *id.* ¶ 68;

- documented approvals for DAA treatment of "multiple F1/F2 inmates" based on individualized assessment, *id.* ¶ 60;

- twice-per-month committee review meetings at which the committee reviews not only the sickest but also "patients in lower stages of fibrosis," *id.* ¶ 61;

- specific, written policy directives and processes regarding prompt communication between site providers and the committee, *id.* ¶ 72 (from which site providers cannot deviate without permission, *id.* ¶ 49);

- a dedicated HCV treatment management coordinator whose sole responsibility is to move patients through the review process and link them to treatment, *id.* ¶ 78; and

- credited testimony from Tennessee's Chief Medical Officer that the state "will soon consider up to four times as many patients per month"[3] and will treat "all F3 and F4 stage HCV inmates" within 12 months, *id.* ¶¶ 62, 79, along with an acknowledgment by the *Atkins* defendants that "treatment of inmates with F3 or F4 fibrosis scores is appropriate," *id.* ¶ 64.

None of that is present here.

**B.    *Atkins* Accepted The Medical Science Plaintiffs' Experts Testified To And Rejected Positions Defendants Urge This Court To Adopt**

Although the policies and practices in this case and *Atkins* differ, the medical science about HCV is necessarily the same. Rather than address that evidence, Defendants elide *Atkins*'s findings about the medical science that contradict positions they have taken in this litigation.

---

[1] *Compare* Transcript of Preliminary Injunction Hearing, ECF Nos. 374–77, at 341:5-7 (Priority 2 and Priority 3 HCV patients seen "[e]very six months or every year") ("PI Tr.").

[2] Although Missouri used to participate in a national, corporate HCV committee that included an infectious disease specialist, Dr. Lovelace testified that he now makes most HCV treatment decisions. *See* PI Tr. 615:20–616:10.

[3] *Compare* PI Tr. 635:18-21 (Dr. Lovelace testifying that after the one-time, $3 million amendment to the MDOC-Corizon contract has been allocated, Defendants will return to treating a maximum of 12 patients at a time).

2

For example, the *Atkins* court found, as Plaintiffs showed here, that HCV diagnosis starts with antibody screening, which is followed by an RNA test. *Atkins* ¶ 22. Despite this and their own expert's testimony that an RNA test is "mission critical," Defendants do not conduct an RNA test before telling an inmate he or she has HCV. *Compare* Pls.' Proposed Findings of Fact and Conclusions of Law, ECF No. 361 ¶ 65 ("Pls.' Proposed FOF/COL"), *with* Defs.' Proposed Findings of Fact and Conclusions of Law, ECF No. 360 ¶ 104 ("Defs.' Proposed FOF/COL").

The *Atkins* court also found that FibroSure and APRI—both blood-test-based calculations—"fail to detect severe liver fibrosis a significant percentage of the time." *Atkins* ¶ 15. At the preliminary injunction hearing, experts from both parties testified to this fact. *See, e.g.*, Pls.' Proposed FOF/COL ¶¶ 12–14, 70, 82. In the face of this clear medical evidence, Defendants insist on using these calculations not only to stage fibrosis but also to ration treatment, *see id.* ¶¶ 14, 75, 118, 125, 126, and go as far as to propose that the Court find "the use of an APRI score with a FIB-4 or FibroSure score provides an accurate estimation of fibrosis," Defs.' Proposed FOF/COL ¶ 45.

Additionally, the *Atkins* court found that sustained virologic response ("SVR") is a "virologic cure" and pointed out that "TDOC's own Medical Director and Associate Medical Director consider DAAs to be a cure," while Defendants urge this Court to find that SVR is an "unvalidated surrogate outcome" that is *not* "the equivalent of a cure." *Compare* Atkins ¶¶ 26, 40, *with* Defs.' Proposed FOF/COL ¶ 48.

The court also found that:

> To proceed with DAA treatment, a physician needs <u>limited information</u>: a face-to-face physical examination to evaluation symptoms, and confirmation that a patient has active HCV-RNA and is chronic. Because of the effectiveness of DAAs, <u>a fibrosis score is less important to treatment or management decisions</u>.

3

*Atkins* ¶ 29 (emphases added). But the evidence at the preliminary injunction hearing showed both that Defendants require much more (often nonmaterial) information to make a treatment decision than the *Atkins* court found necessary, and that Defendants frequently use the purported need to collect information as a reason to delay the initiation of DAA treatment.[4]

Finally, as Defendants (curiously) point out, the *Atkins* court distinguished Tennessee's current practices from the former Pennsylvania practice of denying treatment consideration to anyone without cirrhosis, which a court found constitutionally deficient in *Abu-Jamal v. Wetzel*, No. 16-cv-2000, 2017 WL 34700 (M.D. Penn. Jan. 3, 2017). *See Atkins* ¶ 123. But denying treatment to those without cirrhosis is precisely what Defendants are doing here—with no way to predict who will get cirrhosis and the added complication of relying on tests that do not reliably identify cirrhosis. *See* PI Hearing Ex. D3 (spreadsheet showing inmates prioritized by blood-test calculations); PI Tr. 536:14–537:3 (F3 patients are Priority 2 unless they have an APRI score above 2.0), 577:20–578:9 (Defendants re-test Priority 2 patients to tease out the sickest before considering treatment).

### C. The *Atkins* Court Found Drs. Gerrity and Koretz Not Credible

Defendants relegate to a footnote a key portion of the *Atkins* decision. Two of Defendants' experts—Drs. Koretz and Gerrity—testified at the *Atkins* trial. The court refused to accept their testimony. *Atkins* ¶¶ 38 (Gerrity's opinion is "weak" and lacks a "sufficiently credible explanation"), 39 ("reject[ing] Dr. Gerrity's opinion"), 40 ("declin[ing] to credit Dr.

---

[4] *See, e.g.*, PI Tr. 578:4-9 (Dr. Lovelace teasing out sickest patients by reclassifying); 585:2-17 (repeat blood testing for blood-test-based calculations of fibrosis stage); 625:21–626:17 (affirmative finding of >18 months to live required); 632:11–633:23 (will not present to committee until all information collected); 637:3–638:3 (committee may reject inmate with elevated staging scores based on need for "additional iron studies" or liver lesion); 640:19-25 (single elevated APRI score insufficient at intake or when inmate has new tattoo); 641:22–642:12 (repeat testing); *see also* PI Hearing Ex. P366 (nurse's fourth request for HCV "workup" information); Defs.' Proposed FOF/COL ¶¶ 116 (Defendants proposing that intravenous drug use makes inmate inappropriate candidate for treatment), 129 (Defendants proposing that Dr. Lovelace continually reclassifies inmates based on "newly available laboratory testing data").

4

Koretz's opinion"). Those credibility determinations are particularly important for Dr. Gerrity because she did not testify in person in this action and Defendants instead rely on her testimony in *Atkins*. *See* Gerrity Tr., ECF No. 333-4; *Bush v. Marshalltown Med. & Surgical Ctr.*, 123 F.3d 1130, 1134 (8th Cir. 1997) (district judge's in-person credibility determinations "must be given great deference").

The court in *Atkins* rejected Dr. Gerrity's testimony for two main reasons. First, she was "advocating a personal cause" and "did not offer any convincing explanation" for her opinions. *Atkins* ¶ 38. Second, she exhibited a "gross lack of candor" in failing to disclose a relevant conflict of interest. *Id.* ¶ 39; *see also* ¶ 38 (noting multiple other examples of "evasive" testimony). The court also emphasized Dr. Gerrity's lack of relevant experience, noting that "[s]he is not a gastroenterologist, infectious disease specialist, hepatologist, expert in the field of HCV, or HCV researcher, and she has never prescribed DAAs." *Id.* ¶ 37.

The court rejected Dr. Koretz's testimony for similar reasons. First, relying on his "demeanor and tone," the court found his opinions were infected by "deeply held extreme personal opinions that affected his conclusions." *Id.* ¶ 40; *see also id.* ("Dr. Koretz's personal beliefs have clouded his judgment and call into question his entire analysis."). Second, his opinions had "no support in the record" and were "directly contradicted by established medicine." *Id.* And again, the court emphasized his lack of relevant experience, because "he is neither an infectious disease specialist nor a hepatologist, and has never prescribed DAAs." *Id.*

As such, *Atkins*'s determination that the AASLD/IDSA guidelines do not "determine" the standard of care for HCV is both legally dubious and irrelevant. In *Atkins*, as here, defendants challenged the guidelines through expert opinions by Drs. Gerrity and Koretz. Having rejected those opinions, the court apparently had no credible evidence upon which to base its assessment

5

of the relevance of the guidelines. But perhaps more importantly for this case, Plaintiffs here have put on evidence that the guidelines do not mandate but rather "reflect" the standard of care. *See, e.g.*, Pls.' Proposed FOF/COL ¶¶ 58 (listing the guidelines among multiple other sources that together reflect the medical consensus that establishes the standard of care), 134 (citing evidence and testimony demonstrating that the guidelines reflect the standard of care). Nothing in *Atkins* rebuts that evidence.[5]

### D. The *Atkins* Decision is Distinguishable

*Atkins* is distinguishable from the present case and rests on inapplicable legal conclusions. The decision must be read with both these in mind.

*First*, the court in *Atkins* relied almost exclusively on its determinations regarding Tennessee's Chief Medical Officer, Dr. Williams; namely that: (a) he was a credible witness who was exercising medical judgment, *Atkins* ¶ 128; and (b) he devised a new protocol for addressing HCV that, if implemented properly, would render the state's treatment of HCV constitutionally permissible, *see e.g.*, *id.* 2019 WL 4748299, at *19 (relying on Dr. Williams's "promises and projections about anticipated success under the 2019 HCV Guidance"). Quite simply, there is no person who fills an equivalent role in this case.[6] And it would (of course) be improper for the Court to make decisions based on credibility determinations of a witness not before the Court. In addition, not only is it improper to rest a decision on what a witness or judge *hopes* will happen in the future, *cf. City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982), but to the extent expectations may be relevant, Defendants' witnesses testified that there will *not* be a "significant" or "positive" change in policy. *Compare, e.g.*, *Atkins* ¶ 51, *with* PI Tr. 635:18-21,

---

[5] And, as discussed above, Defendants deviate more significantly from the standard of care than the defendants in *Atkins*. *See* Section A, *supra*.

[6] As an employee of Corizon, Dr. Lovelace has different obligations.

6

*and* Defs.' Proposed FOF/COL ¶¶ 122–124 (treatment of HCV patients identified by Defendants as Priority 1 was only because of an "extraordinary" budget "surplus"). Thus, to the extent *Atkins* rests on Dr. Williams's testimony and particularly his hopes for the future, the decision is irrelevant to this case.

*Second*, the cases *Atkins* cited in support of its decision were exclusively individual (rather than class action) cases, all of which were brought by *pro se* plaintiffs. See *Atkins* ¶ 122. In each of those cases, the plaintiff challenged an individual treatment decision, not a system-wide policy or practice. *See, e.g.*, *Spiers v. Perry*, No. 17-cv-281, 2019 WL 2373199, at *1 (S.D. Miss. June 5, 2019). And in each case, the plaintiff was without the aid of an attorney, preventing (or at the very least hindering) the effective litigation of his claim. *See, e.g.*, *Roy v. Lawson*, 739 F. App'x 266, 267 (5th Cir. 2018) (*pro se* plaintiff failed to argue there was an ongoing constitutional violation); *Spiers*, 2019 WL 2373199, at *1 (*pro se* plaintiff failed to oppose motion for summary judgment); *Pevia v. Wexford Health Source, Inc.*, No. 16-cv-1950, 2018 WL 999964, at *11 (D. Md. Feb. 20, 2018) (*pro se* plaintiff failed to seek any discovery). Those cases are inapposite.

*Third*, the *Atkins* court applied a legal standard that has been rejected in this circuit. In the Sixth Circuit, an inmate seeking a particular treatment must show the treatment actually provided is so deficient as to "shock the conscience or to be intolerable to fundamental fairness." *Atkins* ¶ 91. Not only has the Eighth Circuit never required such a showing, *see Postawko v. Mo. Dep't of Corrs.*, 910 F.3d 1030, 1038 (8th Cir. 2018), it has *specifically rejected* that formulation of the deliberate-indifference standard, *see Williams v. Delo*, 49 F.3d 442, 446 (8th Cir. 1995). Importantly, the *Atkins* court acknowledged that this test—which it characterized as "required in the Sixth Circuit"—was key to its distinguishing cases in other states. See *Atkins* ¶ 124.

7

\* \* \*

For the reasons set forth above, Defendants' characterizations of the *Atkins* decision are inaccurate and unhelpful.

Dated: October 8, 2019

Respectfully submitted,

By: /s/ Meghan C. Cleary
Anthony E. Rothert, #44827
Jessie Steffan, #64861
Omri E. Praiss, #41850
ACLU of Missouri Foundation
906 Olive Street, Suite 1130
St. Louis, Missouri 63108
Phone: (314) 652-3114
Fax: (314) 652-3112
trothert@aclu-mo.org
jsteffan@aclu-mo.org

Gillian R. Wilcox, #61278
ACLU of Missouri Foundation
406 West 34th Street, Suite 420
Kansas City, Missouri 64111
Phone: (816) 470-9938
Fax: (314) 652-3112
gwilcox@alcu-mo.org

Amy E. Breihan, #65499
Megan G. Crane, #71624
RODERICK & SOLANGE
MACARTHUR JUSTICE CENTER
3115 South Grand Blvd., Suite 300
St. Louis, MO 63118
Phone: (314) 254-8540
Fax: (314) 254-8547
amy.breihan@macarthurjustice.org
megan.crane@macarthurjustice.org

Elizabeth L. Henthorne (*pro hac vice*)
Amelia I. P. Frenkel (*pro hac vice*)
Anastasia M. Pastan (*pro hac vice*)
Wilkinson Walsh + Eskovitz, LLP

8

2001 M Street NW
10th Floor
Washington, DC 20036
Phone: (202) 847-4000
Fax: (202) 847-4005
bhenthorne@wilkinsonwalsh.com
afrenkel@wilkinsonwalsh.com
apastan@wilkinsonwalsh.com

Meghan C. Cleary (*pro hac vice*)
Wilkinson Walsh + Eskovitz, LLP
130 West 42nd Street, Suite 1402
New York, NY 10036
Phone: (424) 291-9669
Fax: (202) 847-4005
mcleary@wilkinsonwalsh.com

## CERTIFICATE OF SERVICE

I hereby certify that on the 8th day of October, 2019, a true and correct copy of the foregoing document was electronically filed using the Court's online case filing system, which will send notice to all counsel of record.

By: /s/ Meghan C. Cleary